J-A29012-18

2019 PA Super 70

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| QUADIR BOZEMAN | : | No. 1439 EDA 2017 |

Appeal from the Order April 12, 2017
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s):  CP-51-CR-0011158-2016

BEFORE:   OTT, J., DUBOW, J., and STEVENS*, P.J.E.

OPINION BY OTT, J.:                      **FILED MARCH 08, 2019**

The Commonwealth appeals from the order entered April 12, 2017, in the Philadelphia County Court of Common Pleas, granting a pretrial motion to suppress evidence filed by appellee, Quadir Bozeman.[1]  On appeal, the Commonwealth contends the trial court erred in determining:  (1) the officers had no basis to conduct a traffic stop of Bozeman's vehicle; (2) the officers had no reasonable suspicion to frisk Bozeman for weapons; and (3) the officers had no probable cause to conduct a warrantless search of Bozeman's vehicle.  For the reasons below, we reverse the order of the trial court, and remand for further proceedings.

_____

* Former Justice specially assigned to the Superior Court.

[1] The Commonwealth has properly certified in its notice of appeal that the order "terminates or substantially handicaps the prosecution" pursuant to Pa.R.A.P. 311(d).  Notice of Appeal, 5/4/2017.

The trial court provided the following detailed account of the officers' brief encounter with Bozeman:

Officer Jeffrey Opalski testified that he and Officer George D'Alesio of the Philadelphia Police were on routine patrol in full uniform in a marked vehicle on the evening of October 11, 2016. At approximately 6:10 p.m. the officers were travelling westbound on Master Street before turning left onto Conestoga Street. The officers observed a black Buick Lucerne blocking the driving lane on the one-way residential street. Approaching a couple of car lengths behind the car, the officers also observed that all of its windows were tinted and the passenger-side mirror had no glass. The officers stopped for about 10 seconds and Officer Opalski ran the tags through the Mobile Data Terminal (MDT), which came back negative. The officers then activated their lights and sirens and [Bozeman] responded by backing his car into a parking spot on the side of the street.

After [Bozeman's] car was parked, the officers observed [Bozeman's] head move to the left and out of sight for a few seconds before the driver's side door opened and [he] exited the car. Officer D'Alesio immediately got out and approached [Bozeman] on the driver's side of the car. Officer Opalski followed and approached the rear of the car as Officer D'Alesio asked [Bozeman] for his license and registration. Officer Opalski testified that [Bozeman] was facing towards the rear driver's side of his car and not towards Officer D'Alesio while they were talking. [Bozeman] went through his pockets in an anxious manner as Officer D'Alesio continued speaking to him. When [Bozeman] was not able to produce his license and registration, Officer Opalski asked [Bozeman] for his name and age. [Bozeman] claimed he was 26 years old but then changed his answer to that he was 23 years old. [Bozeman] continued to stand with his body facing the car but had his head turned towards Officer Opalski. Officer Opalski became concerned that he was concealing a weapon based on his prior experience with firearm arrests. Officer Opalski asked [Bozeman] to move to the rear of the car so that a protective frisk could be performed.

Office Opalski testified that during the frisk of [Bozeman's] groin area he was able to identify a large chunk of crack cocaine based upon his prior experience due to feeling a large knot in the bag and uneven cuts in the chunk. Officer Opalski arrested

- 2 -

[Bozeman], retrieved the crack cocaine from his waistband, and placed him in the back of the police vehicle. At this time, Officer D'Alesio searched [Bozeman's] car. One minute later, he signaled to Officer Opalski via hand motion that there was a firearm in the car.

On cross examination, Officer Opalski testified that he did not receive a radio call on [Bozeman's] car and confirmed that the MDT search on the car tags came back negative. After the officer activated the lights and sirens, [Bozeman] immediately parallel parked the car in a legal spot. Officer Opalski admitted that he did not see any bulges prior to the frisk and did not recover the crack cocaine until after [Bozeman] was handcuffed. [Bozeman] eventually did produce a "pink slip," which is a temporary registration, and the officers discovered that the car belonged to a woman whom [Bozeman] claimed was his wife. Additionally, the officers did not issue any Traffic Violation Reports (TVRs) during this incident. Officer Opalski also confirmed that the tinted windows were not completely dark because the officers were able to observe [Bozeman's] silhouette through the rear window. Officer Opalski also confirmed that the Motor Vehicle Code requires a rearview mirror only and that he was and still is unsure if side mirrors are required. When the officers pulled up behind the stopped vehicle, they did not know whether the engine was running, but could see that a driver was in the car[.] Officer Opalski confirmed the car was not parked it was standing initially. On redirect and re-cross examination, the officer testified that it is typical for him to search the groin area when he believes someone might be armed and that he has recovered firearms and narcotics from that area previously.

Officer D'Alesio was called as a witness by the Commonwealth and testified that after noticing [Bozeman's] car blocking the traffic lane on Conestoga Street, he pulled up behind the car for a few seconds, ran the tags, activated the lights and sirens, blew the horn, and signaled for the car to pull over. [Bozeman] pulled over and Officer D'Alesio observed what appeared to be [Bozeman] in a position down to the left towards the driver's side door. The officer and [Bozeman] both exited their vehicles, Officer D'Alesio told [Bozeman] to stay where he was; and [Bozeman] complied. The officer then asked [Bozeman] for his paperwork. [Bozeman] fumbled and dropped things as he looked through his pockets; he was not quite touching the car but was almost pressing himself up against it. Officer D'Alesio stated that [once he] observed United States currency (USC) in the car

and in the center console[,] Officer Opalski moved [Bozeman] to the rear of the car to frisk him due to his demeanor. Officer D'Alesio explained the decision to frisk was based on [Bozeman's] motion to the left while he was in the car [and] because [] he was blading his body away from the officers outside the car. Officer Opalski frisked [Bozeman] and found narcotics [in] the groin area, handcuffed [Bozeman], recovered the narcotics, and took [Bozeman] to the police vehicle.

Officer D'Alesio asserted that he then searched the car because he saw USC in the center console and a screwdriver in the driver's side door pocket. While he was looking for paperwork and for any other indication of contraband, the officer observed what he believed to be pry marks around the driver's side air vent. Officer D'Alesio noted that he has undergone extensive training on the recovery and searching of cars and had previously recovered contraband from behind air vents in that type of car. Officer D'Alesio searched the center console due to observing USC in different denominations, which he claimed is indicative of narcotics activity. Officer D'Alesio testified that observing the USC and [Bozeman's] behavior indicated narcotics activity. He also made the decision to search the vehicle following [Bozeman's] arrest in order to look for additional narcotics, vehicle paperwork, and additional contraband such as weapons following [Bozeman's] arrest. [The officer recovered a firearm that was hidden behind the air vent.]

On cross examination, Officer D'Alesio testified that there were no traffic tickets issued in this case and that a "pink slip," which [Bozeman] possessed, is a temporary registration for a vehicle. He also testified that the firearm was not in plain view, and that he had to remove the air vent to uncover it. He confirmed he did not have a search warrant.

Trial Court Opinion, 1/18/2018, at 2-5 (record citations omitted).

Bozeman was charged with carrying a firearm without a license, carrying

a firearm on a public street in Philadelphia, receiving stolen property, and

possession of a controlled substance.[2]   On December 14, 2016, he filed a

pretrial motion seeking to suppress the evidence recovered during the vehicle

stop and search.  The court conducted a suppression hearing on April 7, 2017.

On April 12, 2017, the trial court entered an order granting Bozeman's motion

to suppress.  This timely Commonwealth appeal followed.[3]

Our standard of review of an order granting a motion to suppress

evidence is well-settled:

> When the Commonwealth appeals from a suppression
> order, we follow a clearly defined standard of review and
> consider only the evidence from the defendant's witnesses
> together with the evidence of the prosecution that, when
> read in the context of the entire record, remains
> uncontradicted.  The suppression court's findings of fact
> bind an appellate court if the record supports those findings.
> The suppression court's conclusions of law, however, are not
> binding on an appellate court, whose duty is to determine if
> the suppression court properly applied the law to the facts.
> **Commonwealth v. Miller**, 2012 PA Super 251, 56 A.3d
> 1276, 1278–79 (Pa. Super. 2012) (citations omitted).  "Our
> standard of review is restricted to establishing whether the
> record supports the suppression court's factual findings;
> however, we maintain *de novo* review over the suppression
> court's legal conclusions."  **Commonwealth v. Brown**, 606
> Pa. 198, 996 A.2d 473, 476 (2010) (citation omitted).
>
> **Commonwealth v. Korn**, 139 A.3d 249, 252–253 (Pa. Super.
> 2016), *appeal denied*, 639 Pa. 157, 159 A.3d 933 (2016).  "It is
> within the suppression court's sole province as factfinder to pass
> on the credibility of witnesses and the weight to be given to their
> testimony.  The suppression court is free to believe all, some or

---

[2] **See** 18 Pa.C.S. §§ 6106, 6108, and 3925, and 35 P.S. § 780-113(a)(16), respectively.

[3] Concomitant to its notice of appeal, the Commonwealth filed a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).

none of the evidence presented at the suppression hearing." ***Commonwealth v. Elmobdy***, 823 A.2d 180, 183 (Pa. Super. 2003) (citations omitted), *appeal denied*, 577 Pa. 701, 847 A.2d 58 (2004). Nevertheless, the suppression court's conclusions of law are not binding on an appellate court, and are subject to plenary review. ***Commonwealth v. Johnson***, 969 A.2d 565, 567 (Pa. Super. 2009) (citations omitted).

***Commonwealth v. Byrd***, 185 A.3d 1015, 1019 (Pa. Super. 2018).

The trial court's ruling in the present case was three-fold. First, the court concluded the officers had no basis to conduct a vehicle stop of Bozeman's car. Second, the court found the officers had no reasonable basis to frisk Bozeman for weapons. Third, the trial court determined there was no basis to conduct a warrantless search of Bozeman's vehicle. The Commonwealth challenges each part of the court's ruling on appeal. Accordingly, we begin with a discussion of the vehicle stop.

A police officer's statutory authority to stop a motor vehicle is codified in Section 6308(b) of the Motor Vehicle Code, which provides:

> Whenever a police officer … has reasonable suspicion that a violation of this title is occurring or has occurred, he may stop a vehicle, upon request or signal, for the purpose of checking the vehicle's registration, proof of financial responsibility, vehicle identification number or engine number or the driver's license, or to secure such other information as the officer may reasonably believe to be necessary to enforce the provisions of this title.

75 Pa.C.S. § 6308(b).

In interpreting this subsection, the courts of this Commonwealth have concluded that a vehicle stop based solely on reasonable suspicion of a motor vehicle violation "must serve a stated investigatory purpose. In effect, the language of Section 6308(b)—'to secure such other information as the officer

may reasonably believe to be necessary to enforce the provisions of this title'—is conceptually equivalent with the underlying purpose of a **Terry**[4] stop." **Commonwealth v. Feczko**, 10 A.3d 1285, 1291 (Pa. Super. 2010) (*en banc*) (internal citations omitted), *appeal denied*, 25 A.3d 327 (Pa. 2011). When no further investigation is necessary to determinate if a driver committed a traffic violation or crime, the officer must possess "probable cause to believe that the vehicle or the driver was in violation of some provision of the Code." **Id.** (quotation and emphasis omitted).

Here, the officers testified that, as they turned onto Conestoga Street, a one-way street with only one lane of travel, they observed Bozeman's vehicle, approximately halfway down the block, stopped in the roadway, "double-parked blocking the lane." N.T., 4/7/2017, at 10. After running the license plate number and receiving negative results, the officers activated their lights and siren, at which time Bozeman backed his vehicle into a parking spot. The officers pulled behind him and observed him lean down to his left side towards the driver's side door, and then immediately exit the vehicle. **See id.** at 11-12.

The vehicle stop was based on a violation of Section 3351 of the Motor Vehicle Code, "Stopping, standing and parking outside business and residence districts," which provides, in pertinent part:

---

[4] **Terry v. Ohio**, 392 U.S. 1 (1968).

**(a) General rule.**--Outside a business or residence district, no person shall stop, park or stand any vehicle, whether attended or unattended, upon the roadway when it is practicable to stop, park or stand the vehicle off the roadway. In the event it is necessary to stop, park or stand the vehicle on the roadway or any part of the roadway, an unobstructed width of the highway opposite the vehicle shall be left for the free passage of other vehicles and the vehicle shall be visible from a distance of 500 feet in each direction upon the highway.

75 Pa.C.S. § 3351(a). In **Commonwealth v. Vetter**, 149 A.3d 71 (Pa. Super. 2016), *appeal denied*, 169 A.3d 577 (Pa. 2017), a panel of this Court found that "stopping a vehicle on the basis of a violation of 75 Pa.C.S. § 3351 requires the police officer to possess probable cause, as that is a violation that does not require further investigation." **Id.** at 75.

The trial court concluded there was no basis for the stop because the officers did not have probable cause to believe that Bozeman violated Section 3351. The court opined:

> Pennsylvania case law demonstrates that the purpose of § 3351 is to prevent traffic congestion and that an actual effect on traffic flow is required to satisfy the probable cause standard. In **Commonwealth v. Spieler**, a police officer had probable cause to stop a truck driver when his "truck stopped motionless in the middle of the flow of traffic, causing a backup of three to four cars[.]" 887 A.2d 1271, 1276 (Pa. Super. 2005). Additionally, in **Commonwealth v. Washington**, the Superior Court in a non-precedential opinion reaffirmed the rationale in **Spieler** by explaining an officer had probable cause to stop a vehicle because "[d]efendant's vehicle was blocking the roadway and interfering with the flow of traffic." No. 2821 EDA 2016, 2017 WL 2304416, at *1 (Pa. Super. Ct. May 26, 2017).[5]

---

[5] We note that the citation to, or reliance upon, any unpublished memorandum decision of this Court is prohibited unless the case involves the same

However, when a traffic violation is momentary and minor, and has no actual effect on surrounding traffic, probable cause will not be established. *Commonwealth v. Garcia*, 859 A.2d 820, 823 (Pa. Super. 2004), established the momentary and minor standard, explaining that when a Motor Vehicle Code violation lasts "for just a momentary period of time and in a minor manner, a traffic stop is unwarranted." In that case, an officer followed a vehicle after watching the car swerve across the white line on the shoulder of the road. *Id.* at 821-22. After watching the vehicle do this once more to avoid oncoming traffic in the other lane, the officer stopped the defendant's car. *Id.* After stopping the vehicle and smelling alcohol on the defendant, the officer completed field sobriety tests and arrested him for DUI. *Id.* On appeal, the evidence was suppressed and the stop was deemed unlawful because of the "minor nature of the infraction, and its brief duration[.]" *Id.* at 823. Likewise, in *Vetter*, the court upheld the suppression of evidence that was recovered after an officer's stop of a vehicle that was not actively obstructing the flow of traffic. 149 A.3d at 75.

Here, the officer did not possess the necessary probable cause to stop [Bozeman's] car. While the officers did observe [Bozeman's] car stopped on a one-way street, the circumstances fell under the 'momentary and minor' exception provided in *Garcia*. The officers testified that the car was only stopped for 10 seconds or less. They activated their sirens, blew the horn, and motioned for [Bozeman] to pull over; he complied. There was no prolonged stop, nor was there a line of cars backed up behind [Bozeman]. Unlike in *Washington* and *Spieler*, [Bozeman's] momentary standing did not affect the flow of traffic and did not pose a safety risk to other drivers. Similar to the facts of *Garcia*, [Bozeman's] violation in this case lasted only for a brief period of time and affected no other cars on the road.

Accordingly, since [Bozeman] stopped his car momentarily before legally parking, the officers did not have the requisite probable cause under § 3351 to conduct a vehicle stop.

Trial Court Opinion, 1/18/2018, at 8-9.

---

defendant or is relevant for *res judicata* purposes, neither of which are present here. *See Commonwealth v. Little*, 903 A.2d 1269, 1272 n.4 (Pa. Super. 2006), *citing* 210 Pa. Code § 65.37(A).

In response, the Commonwealth first asserts the proper standard for stopping a vehicle based on a suspected violation of Section 3351 should be reasonable suspicion, not probable cause. *See* Commonwealth's Brief at 14. To that end, it contends the language in *Vetter* was "non-controlling dictum," and "[a] thorough analysis of the Vehicle Code's text and statutory history demonstrates … reasonable suspicion is the proper standard by which to assess a vehicle stop for a suspected violation of Section 3351." *Id.* at 21.

We disagree. As noted above, Section 3351 prohibits a driver from stopping, parking or standing his vehicle "upon the roadway when it is practicable to stop, park or stand the vehicle off the roadway." 75 Pa.C.S. § 3351(a). Accordingly, when an officer observes a vehicle stopped on the road in such a manner that there is no unobstructed area for the passage of another vehicle, and also sees a "practicable" place for the vehicle to stop or park, no further investigation is necessary to determine a violation of the statute occurred. *Id.* Therefore, we agree with the trial court's determination that the officers needed probable cause to stop Bozeman's vehicle.[6]

The Commonwealth also notes, however, that even if we conclude probable cause is the proper standard, it "was established here because [Bozeman] had no legitimate reasons for double parking in the middle of the road 'when it [wa]s practicable to stop, park or stand the vehicle off the

---

[6] Accordingly, we decline the Commonwealth's request to submit this issue for *en banc* reargument. *See* Commonwealth's Brief at 5 n.2.

roadway.'" Commonwealth's Brief at 27 n.10. The Commonwealth maintains Bozeman "demonstrated the obvious practicability of parking off the roadway when he quickly threw his car into reverse after being directed to pull over." *Id.* We agree.

Officer Opalski testified that while there was one car parked alongside Bozeman, "the whole rest of the block, where [there was] fencing …, there were no cars parked there. So, it was all free spaces to park in." N.T., 4/7/2017, at 12. Under the plain language of the statute, the officers observed a car, either parked, stopped or standing, on the roadway with no room for the "free passage" of other vehicles, at a place where it was clearly "practicable" for the driver to "stop, park or stand the vehicle off the roadway." 75 Pa.C.S. § 3351(a).[7] That is all that is required to find a violation under the statute. Contrary to the trial court's opinion, the statute does not require the actual obstruction of the flow of traffic, nor does it mandate the vehicle be stationary for a specified period of time. We recognize that in *Spieler*, *supra*,

_____

[7] We note Bozeman also emphasizes that Section 3351 regulates traffic only "outside a business or residence district[,]" which he insists does not apply under the present facts. Bozeman's Brief at 8, *citing* 75 Pa.C.S. § 3351(a). *See* 75 Pa.C.S. § 102 (defining business district and residence district). However, we agree with the Commonwealth's characterization of the neighborhood where the incident occurred as an "urban district." *See* Commonwealth's Reply Brief, at 6-7. *See also* 75 Pa.C.S. § 102 (defining "urban district" as "[t]he territory contiguous to and including any street which is built up with structures devoted to business, industry or dwelling houses situated at intervals of less than 100 feet for a distance of a quarter of a mile or more."). It bears mention that Bozeman did not argue this interpretation of the statute before the trial court at the suppression hearing.

- 11 -

a panel of this Court found an officer had probable cause to stop a vehicle for a violation of Section 3351 when the driver sat an intersection through two cycles of a traffic light, causing a three-to-four car backup. **See Spieler**, **supra**, 887 A.2d at 1276. However, the panel did not hold that the length of time the car sat at the light, or the number of cars affected by the offending driver's actions, were required under the statute. Nor do we find any other authority to support this interpretation of the violation.

The trial court also found that the circumstances of the present case "fell under the 'momentary and minor' exception provided in **Garcia**." Trial Court Opinion, 1/18/2018, at 9. Again, we disagree.

In **Garcia**, an officer stopped the defendant after observing him, for a distance of only two blocks, "drive over the right berm line of the road" two times, each time "in response to another car coming toward [the defendant] in the opposite lane of traffic." **Garcia**, **supra**, 859 A.2d at 823. A panel of this Court concluded the defendant's violation of the Motor Vehicle Code was "momentary and minor," and therefore, did not constitute probable cause for a traffic stop. **See id.** However, the violations alleged in **Garcia** were moving violations, *i.e.*, 75 Pa.C.S. §§ 3301 and 3309, that involved a more subjective analysis than the parking violation at issue herein. Section 3301 mandates that a vehicle shall "be driven upon the right half of the roadway," with limited exceptions. 75 Pa.C.S. § 3301(a). Although the defendant in **Garcia** briefly crossed over the right berm line, he did, at all times, remain on the right half of the roadway. **Compare Commonwealth v. Enick**, 70 A.3d 843, 844 (Pa.

Super. 2013) (finding probable cause to stop defendant for violation of Section 3301 officer observed "half of [defendant's] vehicle cross the double yellow lines into oncoming traffic for approximately 2–3 seconds."), *appeal denied*, 85 A.3d 482 (Pa. 2014). Moreover, Section 3309 requires a vehicle to be driven "as nearly as practicable entirely within a single lane and shall not be moved from the lane until the driver has first ascertained that the movement can be made with safety." 75 Pa.C.S. § 3309(a). The defendant in ***Garcia***, who briefly crossed the right berm line as cars approached in the opposite lane, may have ascertained she could do so with safety.

Conversely, in the present case, Officers Opalski and D'Alesio observed Bozeman's vehicle stopped on a one-way street, blocking passage for other vehicles, when there were many parking spots available. To characterize Bozeman's actions as a "momentary and minor" violation of Section 3351, would be to undermine the Motor Vehicle Code, which includes minor traffic offenses. ***See Commonwealth v. Harris***, 176 A.3d 1009, 1019 (Pa. Super. 2017) ("Pennsylvania law makes clear that a police officer has probable cause to stop a motor vehicle if the officer observes a traffic code violation, even if it is a minor offense."). Accordingly, we find the trial court erred when it concluded the traffic stop was unlawful because the officers had probable cause to stop Bozeman, and issue him a citation for violating Section 3351.

Although we have found the traffic stop was lawful, we must next consider whether, as the Commonwealth contends, the officers had a sufficient basis to frisk Bozeman.

- 13 -

It is well-established that the police may conduct a **Terry** frisk under the following circumstances.

> "If, during the course of a valid investigatory stop, an officer observes unusual and suspicious conduct on the part of the individual which leads him to reasonably believe that the suspect may be armed and dangerous, the officer may conduct a pat-down of the suspect's outer garments for weapons." **Commonwealth v. E.M./Hall**, 558 Pa. 16, 735 A.2d 654, 659 (1999). In order to establish reasonable suspicion, the police officer must articulate specific facts from which he could reasonably infer that the individual was armed and dangerous. **See Commonwealth v. Gray**, 896 A.2d 601, 606 (Pa. Super. 2006). When assessing the validity of a **Terry** stop, we examine the totality of the circumstances, **see id.**, giving due consideration to the reasonable inferences that the officer can draw from the facts in light of his experience, while disregarding any unparticularized suspicion or hunch. **See Commonwealth v. Zhahir**, 561 Pa. 545, 751 A.2d 1153, 1158 (2000).

**Commonwealth v. Wilson**, 927 A.2d 279, 284 (2007). "To conduct a pat down for weapons, a limited search or 'frisk' of the suspect, the officer must reasonably believe that his safety or the safety of others is threatened." **Commonwealth v. Simmons**, 17 A.3d 399, 403 (Pa. Super. 2011), *appeal denied*, 25 A.3d 328 (Pa. 2011). This Court, in **Commonwealth v. Carter**, 105 A.3d 765 (Pa. Super. 2014) (*en banc*), *appeal denied*, 117 A.3d 295 (Pa 2015), emphasized the significance of an officer's experience in assessing whether the requisite reasonable suspicion was present:

> In conducting a reasonable suspicion inquiry, a suppression court is required to "afford due weight to the specific, reasonable inferences drawn from the facts in light of the officer's experience[.]" **Commonwealth v. Brown**, 606 Pa. 198, 996 A.2d 473, 477 (2010); **see also Commonwealth v. Foglia**, 979 A.2d 357, 361 (Pa. Super. 2009) (*en banc*) (concluding that reasonable suspicion for a **Terry** stop existed in part because the

defendant "touched his waist area and sat down on a stoop behind some females ... [and t]he police officer was aware, based upon his experience with armed suspects, that weapons are often concealed in a person's waistband[ ]"), *appeal denied*, 605 Pa. 694, 990 A.2d 727 (2010). "Among the circumstances that can give rise to reasonable suspicion are the [officer]'s knowledge of the methods used in recent criminal activity and the characteristics of persons engaged in such illegal practices." ***United States v. Mendenhall***, 446 U.S. 544, 563, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).

***Id.*** at 773.

In concluding the officers in the case *sub judice* had no reasonable suspicion to frisk Bozeman, the trial court opined:

> [T]he totality of the circumstances demonstrate that once [Bozeman] legally parked his vehicle, there existed no reasonable suspicion that actual criminal activity was afoot involving [Bozeman] nor a reasonable inference that he was armed and dangerous to support a ***Terry*** frisk. There are many relevant factors to consider under the facts of this case that together demonstrate the frisk of [Bozeman] was unwarranted. First, it cannot be discounted that the initial stop of [Bozeman] in his motor vehicle was deficient and therefore could not contribute to the belief that he was possibly involved in criminal activity. Further, the baseless stop was predicated on a minor violation of the Motor Vehicle Code, an offense that does not suggest the possession of a concealed weapon. Second, while the officers did note there were some nervous blading movements by [Bozeman], (N.T. 4/7/17 pp. 24, 44-45), the absence of any testimony regarding the presence of a bulge or any reaching towards the waist by [Bozeman] greatly curtails concerns of officer safety. Third, the frisk of [Bozeman] was conducted during daytime hours, in the presence of two police officers, and in a neighborhood that was not deemed a high-crime area—all factors usually present in the many cases that warrant a ***Terry*** frisk by the police. In this case, under the totality of the circumstances, there were not enough facts to justify a protective search of [Bozeman].

Trial Court Opinion, 1/18/2018, at 12.

The Commonwealth insists, however, that the officers had a "reasonable basis to conduct a protective frisk" of Bozeman. Commonwealth's Brief at 28. It asserts "the purpose of the initial traffic stop – to ascertain [Bozeman's] identity and reasons for blocking the road, to obtain ownership documentation for the Buick, and to issue a traffic citation for violating the Vehicle Code – had not been fulfilled when the officers' suspicions that [Bozeman] may be armed first arose." *Id.* at 29. The Commonwealth contends there were "numerous indicia of suspicious conduct" which justified the *Terry* frisk, including Bozeman's (1) furtive movement when he parked the car; (2) immediate exit from the car before the officers' approached; (3) excessive nervousness; and (4) deliberate "blading" of his body away from the officers' view. *Id.* at 29-30. Moreover, the Commonwealth maintains the trial court "placed undue weight" on factors that were not present – such as the stop did not occur at night or in a high-crime area – and "ignored the officers' experience detecting the presence of concealed weapons in similar situation." *Id.* at 31-32. Upon our review of the suppression hearing transcript and relevant case law, we agree.

Officer Opalski testified that as soon as the vehicle was parked, he noticed Bozeman "was just moving around a lot in that front seat." N.T., 4/7/2017, at 13. He stated:

> At one point, [Bozeman's] head went to the left, like towards his door and out of view. I guess blocked by the headrest for a few seconds, so it was quick. And then the door opened and he just stepped out of it.

*Id.* *See also id.* at 42-43 (Officer D'Alesio describing Bozeman's actions after the stop: "I could see the driver, the silhouette, through the back window … leaning done to his left side towards the driver's side door."). Officer Opalski explained his suspicions arose when Bozeman kept his body close to and facing the vehicle while he was speaking to Officer D'Alesio, who was standing to the rear driver's side of the vehicle. The officer testified:

> When I observed [Bozeman], he was not even facing my partner, he was facing the car. Not even really my direction, but kind of facing west, like, across the street. His waist was directly facing the side of the vehicle, the rear driver's door.

*Id.* at 16. While Bozeman's waist was not "pushed up against the car," the officer estimated "it was within six inches, maybe" of the vehicle. *Id.* at 19. Officer D'Alesio stated "[t]he whole time [he] was speaking to [Bozeman], he had his body [bladed] away from [the officer] towards the car. He was … almost pressing himself up against the car." *Id.* at 44. Office Opalski described Bozeman as "anxious or nervous," as he was fumbling for paperwork, which he never did produce. *Id.* at 20. Furthermore, when the officer asked Bozeman his age, he replied "26 and within a second later he said, no, 23." *Id.* Officer Opalski stated that, in his experience, when a suspect attempts to conceal his waistband as Bozeman did in the present case, it is an indication "[t]hat he might be armed." *Id.* at 24. Accordingly, based on Bozeman's suspicious behavior and his own experience, the officer proceeded to frisk Bozeman for weapons. In doing so, he recovered a baggie of crack cocaine from Bozeman's groin area. *See id.* at 25-26.

Here, the totality of the circumstances present during the vehicle stop was sufficient to supply reasonable suspicion for a *Terry* frisk. Again, rather than focusing on the factors present that supported the officers' suspicion, the trial court focused on factors that were not present, *i.e.*, the vehicle stop was not for a violent offense, nor did the stop occur at night or in a high crime area. *See* Trial Court Opinion, 1/18/2018, at 12. Moreover, while the court acknowledged the officers' testimony regarding Bozeman's "nervous blading movements," it emphasized the fact that the officers did not notice a bulge in Bozeman's waistband or observe him reach towards his waist. *Id.* In doing so, we find the court failed to "afford due weight to the specific, reasonable inferences drawn from the facts in light of the officer's experience[.]" *Carter*, *supra*, 105 A.3d at 773 (citation omitted). The court gave no credence to Officer Opalski's testimony that the blading movements Bozeman used to conceal his waistband were "consistent with other gun arrests" he had made. N.T., 1/18/2018, at 24. Indeed, Officer Opalski testified he had made 70 to 100 gun arrests, and a "high percentage" of those involved firearms in a waistband. *Id.* at 22.

In *Carter*, an *en banc* panel of this Court emphasized the importance of considering the **totality** of the circumstances presented to the police officer at the time he makes the determination of whether there is reasonable suspicion to conduct a *Terry* frisk. *See Carter*, *supra*, 105 A.3d at 772-773. The panel noted that, "even in a case where one could say the conduct of a person is equally consistent with innocent activity, the suppression court

would not be foreclosed from concluding reasonable suspicion nevertheless existed." *Id.* at 772. Here, although Bozeman was stopped for a minor traffic offense, he made a furtive movement, before quickly exiting the vehicle as the officers approached. As he nervously fumbled for his paperwork, which he was not able to produce, he stood with his waist close to his vehicle as if he were concealing something in his waistband. Officer Opalski testified that a high percentage of the firearm arrests he has made involved firearms in a waistband, and that, in his experience, when a suspect "blades" his body away from the officer in such a way that conceals his waistband, it is an indication the suspect "might be armed." N.T., 4/7/2017, at 24. Based on the totality of the circumstances, we conclude the officers possessed the requisite reasonable suspicion that Bozeman might be armed and dangerous. Accordingly, we find the trial court erred in suppressing the narcotics recovered from Bozeman during the frisk.[8]

---

[8] The cases Bozeman cites in his brief are clearly distinguishable. **See** Bozeman's Brief at 11. In **Commonwealth v Lechner**, 685 A.2d 1014 (Pa. Super. 1996), the panel did not even discuss the reasonable suspicion standard for a **Terry** frisk. Rather, in that case, the panel found officers acted illegally when, based solely on a tip from an unknown informant that defendant would have drugs in his truck at a certain time and location, they ordered the defendant out of his truck and immediately frisked him and searched the vehicle. **See id.** at 1015, 1019. Similarly, in **Commonwealth v. Preacher**, 827 A.2d 1235 (Pa. Super. 2003), an officer received an anonymous tip that a man was selling cocaine at a nearby bar. **See id.** at 1236-1237. When the officer arrived, he observed the defendant, a known drug trafficker who matched the description given by the informant, sitting at the bar counting money. **See id.** at 1237. The defendant tossed the money to the side as the officer approached him. The officer told the defendant about

Lastly, we must determine whether the warrantless search of the vehicle was proper. Generally, "a search conducted without a warrant is presumed to be unreasonable unless it can be justified under a recognized exception to the search warrant requirement." **Commonwealth v. Davis**, 188 A.3d 454, 457 (Pa. Super. 2018) (citation omitted). One such exception exists when a police officer possesses probable cause to search a lawfully stopped motor vehicle. **See id.** In **Commonwealth v. Gary**, 91 A.3d 102 (Pa. 2014) (plurality opinion), the Pennsylvania Supreme Court adopted the federal automobile exception, holding "[t]he prerequisite for a warrantless search of a motor vehicle is probable cause to search; no exigency beyond the inherent mobility of a motor vehicle is required." **Id.** at 138. Therefore, "where police possess probable cause to search a car, a warrantless search is permissible." **Davis**, **supra**, 188 A.3d at 458, *quoting* **In re I.M.S.**, 124 A.3d 311, 317 (Pa. Super. 2015).

Probable cause is defined as follows:

_____

the investigation, and immediately frisked him. **See id.** A panel of this Court found the officer had no reasonable suspicion that the defendant might be armed and dangerous. **See id.** at 1240. **See also Commonwealth v. Reppert**, 814 A.2d 1196, 1206 (Pa. Super. 2002) (*en banc*) (excessive nervousness and furtive movements alone insufficient to supply reasonable basis for investigatory detention of passenger during car stop), and **Simmons**, **supra**, 17 A.3d at 405 (noting original traffic stop in **Reppert** was concluded **before** officer ordered defendant passenger out of car). As noted above, the facts in the present case include furtive movements in the car, excessive nervousness, and an attempt by the defendant to shield his body from police during the stop. Further, the officers testified regarding their own experience with such suspicious actions.

Probable cause is made out when the facts and circumstances which are within the knowledge of the officer at the time of the [stop], and of which he has reasonably trustworthy information, are sufficient to warrant a man of reasonable caution in the belief that the suspect has committed or is committing a crime. The question we ask is not whether the officer's belief was correct or more likely true than false. Rather, we require only a *probability*, and not a *prima facie* showing, of criminal activity. In determining whether probable cause exists, we apply a totality of the circumstances test.

**Byrd**, **supra**, 185 A.3d at 1023–1024 (emphasis in original), *quoting*

**Commonwealth v. Martin**, 101 A.3d 706, 721 (Pa. 2014), *cert. denied*, 136

S.Ct. 201 (U.S. 2015).

In the present case, the trial court found the search of the vehicle was not permissible as a search incident to arrest or a protective sweep because Bozeman was "far removed" from his vehicle when Officer D'Alesio conducted the search.[9] Trial Court Opinion, 1/18/2018, at 14, 16. In fact, Bozeman was handcuffed and placed in the back of the police vehicle after narcotics were found on his person, and before the officer conducted the search. **See** N.T., 4/7/2017, at 45. The Commonwealth does not dispute this finding, but rather maintains the officers had probable cause to search the vehicle pursuant to

---

[9] Both a protective sweep and a search incident to arrest are permissible only in the area where the suspect may gain control of a weapon. **See Michigan v. Long**, 463 U.S. 1032, 1049 (1983) (holding protective search of an automobile, "limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief … that the suspect is dangerous and the suspect may gain immediate control of weapons."); **Commonwealth v. White**, 669 A.2d 896 (Pa. 1995) ("[T]here is no justifiable search incident to arrest under the Pennsylvania Constitution save for the search of the person and the immediate area which the person occupies during his custody[.]").

***Gary***, ***supra***. ***See*** Commonwealth's Brief at 32-35. With regard to this argument, the court opined:

> As it concerns the Commonwealth's contention that the officers had probable cause that the vehicle contained evidence of [Bozeman's] arrest for possession of cocaine, this reasoning also falls short. The rationale of the officers that the presence of USC and a screwdriver in the vehicle gave rise to probable cause that additional evidence of criminal activity was present is inadequate. On their face, the items were innocuous and devoid of any criminal nature and even after [Bozeman's] arrest displayed a minimal connection to a drug offense. Under the totality of the circumstances, the presence of the items inside the vehicle were insufficient to permit the warrantless search of [Bozeman's] vehicle.

Trial Court Opinion, 1/18/2018, at 16.

The Commonwealth, however, insists the totality of the circumstances surrounding the incident provided the officers with the requisite probable cause to search behind the air vent of the vehicle:

> Because [Bozeman] "had left his door open when he voluntarily jumped out of the car," . . . Officer D'Alesio had an unobstructed view of its interior. In addition to the U.S. currency in plain view on the center console, which Officer D'Alesio testified was "indicative [of] narcotics activity," the officer also saw the bright orange handle of the flathead screwdriver in the open driver door pocket – the exact location toward which [Bozeman] had "dipped" before spontaneously exiting his car – and numerous pry marks on the driver-side air vent. Officer D'Alesio demonstrated the requisite nexus to search the vacant space behind the vent based on his specialized training in vehicle searches and prior experience discovering contraband hidden behind air vents in vehicles like the Buick Lucerne – highly relevant factors that the suppression court failed to acknowledge[.] Having already discovered illegal narcotics on [Bozeman's] person, the officer reasonably believed that additional contraband was hidden behind the vent.

Commonwealth's Brief at 33-34 (some citations and some punctuation omitted).

After a thorough review of the certified record, particularly the photographs of the car interior, and relevant case law, we are, once again, compelled to agree with the Commonwealth. In finding probable cause to search was not established, the trial court focused solely on "the presence of USC and a screwdriver in the vehicle," which the court characterized as "innocuous [items,] devoid of any criminal nature" with "minimal connection to a drug offense." Trial Court Opinion, 1/18/2018, at 16. In doing so, the court failed to consider the totality of the circumstances, including Officer D'Alesio's relevant training and experience at the time of the search. *See* *Byrd*, *supra*.

Officer D'Alesio testified that, when Bozeman exited the vehicle, he left the driver's side door open. *See* N.T., 4/7/2017, at 45. From his vantage point outside the vehicle, the officer could see money "in several denominations" in the center console. *Id.* at 51. He testified that the money, accompanied by Bozeman's suspicious behavior, "was indicative to [him] as narcotics activity." *Id.* Once his partner recovered the crack cocaine from Bozeman, Officer D'Alesio "brought his attention back to the vehicle[,]" where he could see a flathead screwdriver in the side pocket of the open driver's side door. *Id.* at 45. The officer explained that, based on his experience and training, the air vent of the car which Bozeman was driving "is a popular area to hide contraband." *Id.* at 45-46. *See id.* at 46-47 (detailing Officer

D'Alesio's training through the Northeast Counterdrug and Training Center, the Maryland State Police, and Philadelphia Police). Officer D'Alesio stated he attended training specifically focused on "indications of contraband being hidden in vehicles" and "hidden compartments as well as natural voids of vehicles." *Id.* at 46-47. Moreover, he confirmed that he had, in fact, on prior occasions, recovered contraband from behind the air vent in the type of car Bozeman was driving. *See id.* at 47. Accordingly, Officer D'Alesio testified that, once he noticed the screwdriver, he began to look for pry marks anywhere in the vehicle, and "[w]ithin probably ten seconds[,]" he observed the pry marks near the air vent in Bozeman's car. *Id.* at 53. At that point, the officer removed the air vent and discovered a firearm. *See id.* at 56-57.

Accordingly, at the time of the search, Officer D'Alesio knew the following: (1) after being stopped for a minor traffic violation, Bozeman leaned down toward the driver's side door before immediately exiting his vehicle, unprompted by police; (2) Bozeman acted nervous upon questioning and was unable to produce any paperwork; (3) Bozeman had narcotics in his groin area that he attempted to hide from police; (4) there were multiple denominations of cash in the center console; (5) there was a flathead screwdriver in the driver's side door pocket, the area where Bozeman leaned after the vehicle stop; and (6) there were pry marks near the driver's side air vent. These circumstances, coupled with Officer D'Alesio's specific training, regarding hidden compartments in vehicles, and his experience in recovering

contraband from vehicles like the one at issue, provided the requisite probable cause for him to remove the air vent where the firearm was discovered.

Accordingly, because we conclude the trial court erred in granting Bozeman's pretrial motion to suppress, we reverse the order on appeal and remand for further proceedings.

Order reversed. Case remanded for further proceedings consistent with this Opinion. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/8/19