J-S44013-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: Z.X.F.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: Z.X.F.M., MINOR | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 524 EDA 2025 |

Appeal from the Dispositional Order of January 15, 2025
In the Court of Common Pleas of Delaware County Criminal Division at
No(s):  CP-23-JV-0001058-2023

BEFORE:  LAZARUS, P.J., DUBOW, J., and SULLIVAN, J.

MEMORANDUM BY LAZARUS, P.J.:            **FILED FEBRUARY 6, 2026**

Z.X.F.M. appeals from the trial court's dispositional order following his adjudication of delinquency for possession of a firearm without a license[1] and possession of a firearm by a minor.[2]  He challenges the trial court's denial of his pre-trial motion to suppress.  After careful review, we affirm.

On December 27, 2023, the Commonwealth filed a delinquency petition charging Z.X.F.M. with various firearm-related offenses.  Z.X.F.M. filed a suppression motion on May 17, 2024, in which he argued that the police did not have reasonable suspicion to conduct the investigatory stop or the subsequent pat-down search, and, therefore, all physical evidence should be suppressed.  The trial court held a suppression hearing on June 28, 2024,

---

[1] 18 Pa.C.S.A. § 6106(a)(1).

[2] *Id.* at § 6110.1(a).

deferred its decision to consider the evidence and parties' arguments, and denied the motion at a hearing on September 6, 2024.

In its opinion, the trial court[3] made the following findings of fact:

This matter started with a 911 call. On or around December 21, 2023, [at] or around 4:09[:52 p.m.], a 911 [c]aller reported to the dispatcher that while he was at a McDonald's restaurant[,] located at 133 South 69th street in Upper Darby, [Delaware County], a group of juveniles assaulted and tried to rob him. Specifically, when asked "Did they hit you? Did they assault you?" he responded that they did. The caller then stated that he fled to the nearby Dollar Store, and that the juveniles were outside the store. . . . [The caller] responded affirmatively to the question whether the juveniles waiting outside the Dollar Store (where the caller sought refuge) had weapons, even though he could not identify the exact type. At the end of the call, he stated that the juveniles were walking back towards the McDonald's.

During the call, the dispatcher asked the caller for his name. He replied: "My name is Josh." The dispatcher asked for his last name. Josh gave his last name to the dispatcher several times, but it was difficult to understand due to a language barrier as well as background noise. [ ] In fact, several exchanges during the call were inaudible due to the language barrier and background noise. It is undisputed that the call log contains Josh's identity, address, and telephone number.

Following the call, several officers from the Upper Darby Police Department were dispatched to the 200 block of South 69th Street. Sergeant Louis P. Garay has worked in law enforcement for fifteen years and is a ten-year veteran of the Upper Darby Police Department. Upon arrival at or around 4:11 [p.m.]— approximately ninety seconds to two minutes after the 911

_____

[3] The Honorable Deborah A. Krull presided over the suppression hearing, held on June 28, 2024. Judge Krull denied the motion orally at a hearing on September 6, 2024, at which time she placed her findings of fact and conclusions of law on the record. *See* N.T. Motion Hearing, 9/6/24, at 3–8. The case was then assigned to the Honorable Rachel Ezzel Berry, who was designated to write the opinion based on the findings of Judge Krull.

dispatcher recorded the report—Sergeant Garay encountered a group of black male juveniles consistent with the reported description in the area of the McDonald's. Further, he testified the area generally experiences violent crimes.

Sergeant Garay confirmed the juveniles matched the description he was provided [ ]—black male juveniles in dark clothing—and believed them to be those involved in the 911 call regarding the alleged threatening language, robbery, and assault. Officer James Friel, who had been on bicycle patrol of the area prior to responding, also confirmed the group of juveniles "matched the description of the males [they] were looking for."

As Sergeant Garay approached the group, he observed the juveniles behaving evasively[,] behaviors also observed by Officer Friel. Namely, they avoided eye contact with and began to walk away from the officers. Sergeant Garay (as well as Officer Friel) also observed the juveniles reaching their hands in their pockets despite being told to keep their hands out of their pockets. Sergeant Garay believed the juveniles could be armed and ordered a pat down of the juveniles for the purpose of officer safety. Sergeant Garay instructed the juveniles to stop and remain by the entrance to the McDonald's restaurant.

Additional assisting officers conducted pat downs. Officer Friel, who has over twenty years of experience in law enforcement, conducted the pat down of A.M. just outside of the McDonald's. He had likewise observed Z.[X.F.]M. continually placing his hands in his pockets despite being told not to do so. He believed Z.[X.F.]M. was "trying to conceal something." Officer Friel conducted a pat down, ". . . felt a hard object, which was immediately recognizable[,]" and recovered a firearm from Z.[X.F.]M.'s person.

Trial Court Opinion, 4/11/25, at 2−4 (citations omitted).

On January 15, 2025, the trial court adjudicated Z.X.F.M. delinquent and entered a disposition, sentencing him to probation. Z.X.F.M. filed a timely

notice of appeal and court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal.[4]  He raises a single issue for our review:

> Whether the trial court erred in finding that the 911 call was not anonymous and[,] thus[,] there was reasonable suspicion for the Police to stop [Z.X.F.M.] and [perform] a ***Terry***[5] frisk [] on the bas[i]s of officer safety[.]

Appellant's Brief, at 4 (unnecessary capitalization omitted).

Z.X.F.M. argues that the trial court erred in denying his motion to suppress because the investigative detention was based solely on an anonymous tip and was, therefore, unreliable.  ***See*** Appellant's Brief, at 19, 21–22, 23–24.  He avers that the caller only identified himself by his first name, did not give his home address or telephone number, and did not speak directly to the police officers who stopped him.  ***Id.*** at 19–20.  Thus, he asserts, the informant's report is unreliable and the other factors the trial court cites—Z.X.F.M.'s presence in a high-crime area and behavior when approached by police—do not, even taken together, establish the necessary quantum of reasonable suspicion.  ***Id.*** at 15, 24–26.

Our standard of review in addressing a trial court's denial of a motion to suppress evidence is as follows:

_____

[4] Z.X.F.M. petitioned for leave to file an interlocutory appeal of the suppression ruling on October 14, 2024, which was denied by the trial court on October 30, 2024.

[5] ***Terry v. Ohio***, 392 U.S. 1 (1968); ***see also Arizona v. Johnson***, 555 U.S. 323 (2009) (reaffirming ***Terry***).

[An appellate court's] standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, [the appellate court is] bound by [those] findings and may reverse only if the court's legal conclusions are erroneous. Where . . . the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to [ ] plenary review.

*Commonwealth v. Smith*, 164 A.3d 1255, 1257 (Pa. Super. 2017) (quoting

*Commonwealth v. Jones*, 121 A.3d 524, 526–27 (Pa. Super. 2015))

(alterations in original).

The Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution protect citizens from unreasonable searches and seizures, ensuring their right "to be secure in their persons, houses, papers, and effects[.]" *Commonwealth v. Barnes*, 296 A.3d 52, 56 (Pa. Super. 2023). We recognize three levels of warrantless interactions between police officers and private citizens:

The first [type of interaction] is a mere encounter, sometimes referred to as a consensual encounter, which does not require the officer to have any suspicion that the citizen is or has been engaged in criminal activity. . . . The second type of interaction, an investigative detention, is a temporary detention of a citizen. This interaction constitutes a seizure of a person, and to be constitutionally valid[,] police must have a reasonable suspicion that criminal activity is afoot. The third, a custodial detention, is

the functional equivalent of an arrest and must be supported by probable cause.

***Commonwealth v. Anderson***, 276 A.3d 282, 293 (Pa. Super. 2022) (en banc) (quoting ***Commonwealth v. Adams***, 205 A.3d 1195, 1199–1200 (Pa. 2019)).

In this case, the parties and the trial court agree that the encounter between police and Z.X.F.M. at the entrance to the McDonald's was an investigatory detention. ***See*** Appellant's Brief, at 14; Commonwealth's Brief, at 11–12; Trial Court Opinion, 4/11/25, at 5. Upon review, we agree. Thus, the question before us is whether the trial court properly found that the police officers had reasonable suspicion to initiate the detention.

"[T]he question of whether reasonable suspicion existed at the time of an investigatory detention must be answered by examining the totality of the circumstances to determine whether there was a particularized and objective basis for suspecting the individual stopped of criminal activity." ***Commonwealth v. Thomas***, 273 A.3d 1190, 1197 (Pa. Super. 2022) (citations omitted). The search is constitutionally permissible only if "specific and articulable facts[,]" and rational inferences derived therefrom, reasonably support the officers' actions. ***Adams***, 205 A.3d at 1203. Police officers may rely on information they receive from third parties, including citizen tips, and need not personally observe any illegal or suspicious conduct. ***Commonwealth v. Lohr***, 715 A.2d 459, 461 (Pa. Super. 1998).

When analyzing all relevant circumstances, the relative quality of a tip is critical; "if a tip has a relatively low degree of reliability, more information

will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable." ***Commonwealth v. Barber***, 889 A.2d 587, 593 (Pa. Super. 2005) (quotation omitted); ***see Commonwealth v. Hayward***, 756 A.2d 23, 28 (Pa. Super. 2000). "The informer's reliability, veracity, and basis of knowledge are all relevant factors[.]" ***Barber***, 889 A.2d at 594 (quoting ***Commonwealth v. Korenkiewicz***, 743 A.2d 958, 964 (Pa. Super. 1999) (en banc)). "[I]dentified citizens who report their observations of criminal activity to police are assumed to be trustworthy, in the absence of special circumstances, since a known informant places himself at risk of prosecution for filing a false claim if the tip is untrue[.]" ***Id.*** In contrast, an anonymous source, while not to be entirely discounted, must be evaluated with appropriate suspicion. ***See id.***

Z.X.F.M. asserts that the 911 call that initiated this case was an anonymous tip, and, further, that his detention was based solely on that tip. We cannot agree.

First, as the trial court aptly observed, the tipster was not anonymous. ***See*** Trial Court Opinion, 4/11/25, at 7–8. The 911 caller, Josh, provided his full name and present location, and, according to the call log, the dispatcher knew his phone number and home address. ***Id.*** at 7; ***see*** N.T. Suppression Hearing, 6/28/24, at 10–15; Exhibits C-1, C-2. Josh remained on the phone with the dispatcher, narrating events as they occurred and relaying his alleged assailants' movements in real time. ***See*** N.T. Suppression Hearing, 6/28/24, at 10–15; Ex. C-1; ***see Lohr***, 715 A.2d at 462 (caller remained on the line,

at location where he reported DUI). He reported the approximate number of juveniles, their location, and the direction in which they were headed. *See* N.T. Suppression Hearing, 6/28/24, at 12–14. As the trial court observed, Josh provided all information the dispatcher requested. *See* Trial Court Opinion, 4/11/25, at 7–8; *see also* N.T. Suppression Hearing, 6/28/24, at 10–15. The fact that Josh's full name was not reflected in the 911 call record was the unavoidable consequence of surrounding circumstances and does not undermine the reliability of the information he provided.

As the trial court recognized, the circumstances in this case are remarkably similar to those in *Lohr*, *supra*. In that case, a citizen called 911 and told the dispatcher he observed a possible DUI. *Id.* at 460. The citizen provided his name, remained on the line throughout the dispatcher's communication with the responding officers, and provided ongoing, detailed observations in real time. *Id.* at 462. In affirming the trial court's denial of the suppression motion, this Court noted the caller

> was not anonymous in the sense of being ephemeral; he was located, named, and identified. He exposed himself to police scrutiny and risk of prosecution had the information been contrived; we can hardly presume citizens would do so unless their information was well[-]founded. This warrants the logical conclusion the information was unlikely to be contrived. This report was consequently ingrained with a high degree of reliability, which did not necessitate an inordinate amount of corroboration to be credible.

*Id.*

Similarly, in **Barber**, this Court rejected a defendant's argument that the tip that led to his detention was anonymous and, therefore, unreliable, where the informant provided his name, phone number, location, and a clear description of the events he was reporting. **Id.** at 589, 594–95. The **Barber** Court further noted that the tip included ongoing information based on the informant's personal observations, and its content was unequivocal. **Id.** at 595. When the police reported to the location within five to seven minutes, the description and location matched the report. **Id.** at 594.

Z.X.F.M. argues that this case is distinguishable from **Barber** and **Lohr** because the dispatcher "never learned the full identity of the 911 caller, no telephone number was provided, and the police officer never located the 911 caller on scene nor [was he] able to attest[]that the caller remained on scene until police arrived." Appellant's Brief, at 24. These factual distinctions, however, are not relevant to the tip's reliability or its effect on the reasonableness of the officers' suspicion. By providing his last name to the 911 dispatcher, Josh believed he was putting himself at risk of prosecution for a false claim, regardless of whether the dispatcher was able to understand it; thus, he was no more likely to initiate a prank call or report a mere hunch than a fully identified informant. **See** N.T. Suppression Hearing, 6/28/24, at 14; **see also, e.g.**, **Commonwealth v. Jackson**, 698 A.2d 571, 574 (Pa. 1997) ("[A] known informant places himself or herself at risk of prosecution for filing a false claim if the tip is untrue, whereas an unknown informant faces no such risk[;]" anonymous tip may be a "mere prank call" or based on

nothing more than "the caller's unparticularized hunch"). Similarly, Josh told the dispatcher his exact location as he was told police were approaching. *See* N.T. Suppression Hearing, 6/28/24, at 11, 12, 13, 14, 15; *see Lohr*, 715 A.2d at 462.

Moreover, while the record does not specifically reflect whether Josh remained on the line while Z.X.F.M. was detained and searched,[6] this does not affect the reasonableness of the dispatcher's suspicion at the time she conveyed the caller's tip to the responding officers. *See Commonwealth v. Mackey*, 177 A.3d 221, 227–28 (Pa. Super. 2017) (relevant inquiry is whether officer possesses reasonable suspicion at time of stop).

> [F]or a stop to be valid, **someone in the police department must possess sufficient information to give rise to reasonable suspicion. The officer with the reasonable suspicion, usually the dispatcher, need not convey all of this background information to the officer who actually effectuates the stop**. Thus, the police may justify the search by presenting sufficient evidence at the suppression hearing that someone in the chain of command had reasonable suspicion before the stop, even if the arresting officer did not.

*Commonwealth v. Anthony*, 977 A.2d 1182, 1187 (Pa. Super. 2009) (emphasis added) (alteration in original). Thus, the fact that the dispatcher spoke directly to Josh and then conveyed the information to the responding officers also does not, as Z.X.F.M. suggests, preclude a finding of reasonable

---

[6] The trial court's inference that Josh "remained on or nearby the scene" while the stop took place, based on the very short time frame, is logically sound. Trial Court Opinion, 4/11/24, at 7.

- 10 -

suspicion here. **See also Barber**, 889 A.2d at 594 n.5 (dispatcher did not need to specifically inform responding officers that source of report identified himself to establish reasonable suspicion).[7]

Furthermore, **even if** the tip had been anonymous, and, therefore, viewed as less reliable, the trial court appropriately determined that, under the totality of the circumstances, the police had reasonable suspicion to detain Z.X.F.M. The trial court observed that the 911 caller contacted the dispatcher immediately after the alleged assault and told the dispatcher that the juveniles were walking toward the McDonald's where the assault took place. **See** Trial Court Opinion, 4/11/25, at 8. No more than two minutes elapsed between the report and the police officers' arrival on scene, and the descriptions and locations of the call and scene matched. **Id.** The trial court further cited the caller's concern that the juveniles had weapons, the fact that the assault and stop occurred in a high-crime area, and the police officers' independent

_____

[7] Z.X.F.M. likens this case to **Florida v. J.L.**, 529 U.S. 266 (2000), **Jackson**, **supra**, and **Mackey**, **supra**, correctly asserting that all three held that "an anonymous tip that a particular person in a particular location is carrying a firearm does not, by itself, establish reasonable suspicion for an investigative detention." Appellant's Brief, at 16–21. These cases, however, address a different issue; specifically, whether an anonymous tip that someone is carrying a gun, without more, is sufficient to establish reasonable suspicion the individual is either engaging in criminal activity or about to do so. **J.L.**, 529 U.S. at 272; **Jackson**, 698 A.2d at 574–75; **Mackey**, 177 A.3d 231–33. Here, Josh did not allege Z.X.F.M. had a gun; he alleged Z.X.F.M. had assaulted him, an undeniably illegal act. The fact that the present case arises out of gun charges does not make this case analogous to **J.L.**, **Jackson**, or **Mackey**.

observations of the juveniles' evasive behavior to find the officers had reasonable suspicion to support the investigative detention of Z.X.F.M. *Id.* at 8; *see, e.g.*, *In re D.M.*, 781 A.2d 1161, 1163–64 (Pa. 2001) (high crime area[8] plus "nervous, evasive behavior" of defendant sufficient to find reasonable suspicion for investigative stop under totality of circumstances, despite reliance on anonymous report); *In Interest of S.D.*, 633 A.2d 172, 174 (Pa. Super. 1993) (reasonable suspicion established where anonymous pedestrian gave general description, but incident took place in high-drug-incidence area, suspects were only people in vicinity and were precisely where informant said they would be, and police stopped suspects approximately 50 feet from where officer received information). Accordingly, the officers had the requisite reasonable suspicion to stop Z.X.F.M. and his claim is without merit.

In his next claim, Z.X.F.M. argues that the pat-down search was an unjustified frisk under *Terry*. *See* Appellant's Brief, at 26. He reiterates that the 911 call was unreliable, the caller, though he indicated he believed the assailants were armed, was not sure what kinds of weapons were involved, and the police report and testimony did not indicate that the police observed any weapon or bulge in Z.X.F.M.'s jacket. *Id.* at 26–27. Instead, he asserts,

_____

[8] Z.X.F.M. correctly observes that mere presence in a high-crime area cannot establish reasonable suspicion. *See* Appellant's Brief, at 25. This does not, however, prevent its consideration, when combined with additional factors, in a totality-of-the-circumstances analysis. *See, e.g.*, *Interest of T.W.*, 261 A.3d 409, 424 n.5 (Pa. 2021).

the officers testified only that the pat-down was conducted for officer safety. *Id.* at 27.

A search without a warrant is presumptively unreasonable. *Mapp v. Ohio*, 367 U.S. 643, 647 (1961); *Commonwealth v. Chase*, 960 A.2d 108, 113 (Pa. 2008). One notable exception is a *Terry* frisk, which permits a police officer to conduct a pat-down "if the officer observes conduct that leads him to reasonably believe the suspect may be armed and dangerous." *Commonwealth v. Wright*, 224 A.3d 1104, 1109 (Pa. Super. 2019). The purpose of the stop-and-frisk exception is to "attempt to discover the presence of weapons which may be used to endanger the safety of police or others." *Commonwealth v. Cunningham*, 287 A.3d 1, 11 (Pa. Super. 2022) (quoting *Commonwealth v. Wilson*, 927 A.2d 279, 285 (Pa. Super. 2007)); *see also Adams*, 205 A.3d at 457 ("officer safety is a legitimate governmental interest that is worthy of protection"). The frisk "does not require the officer to 'be absolutely certain that the individual is armed[.]'" *Interest of T.W.*, 261 A.3d at 421. However, "[t]o validate a *Terry* frisk, the police officer must be able to articulate specific facts from which he reasonably inferred that the individual was armed and dangerous." *Cunningham*, 287 A.3d at 10 (quoting *Commonwealth v. Gray*, 896 A.2d 601, 605–06 (Pa. Super. 2006); *see also Commonwealth v. Bozeman*, 205 A.3d 1264, 1274 (Pa. Super. 2019).

A determination as to the constitutionality of a pat-down search requires a court to analyze the reasonableness of the officer's belief that the target is armed and dangerous, based on the totality of the circumstances. *Id.* In

- 13 -

considering those circumstances, the suppression court may give "due consideration to the reasonable inferences that the officer can draw from the facts in light of [the officer's] experience, while disregarding any unparticularized suspicion or hunch." *Id.* (citation omitted).

Instantly, as the trial court found, the record reflects that the 911 caller told the dispatcher his assailants had weapons, though he was unsure what kind. *See* Trial Court Opinion, 4/11/25, at 2; N.T. Suppression Hearing, 6/28/24, at 13–14. In addition, Sergeant Garay testified that when he attempted to stop the juveniles, including Z.X.F.M., they were "blading their bodies away from [him], reaching hands in their pocket[s]. They're being told to take them out. The hands are going back in their pocket[s]." N.T. Suppression Hearing, 6/28/24, at 32. The trial court did not err in finding that these movements, combined with Sergeant Garay's years of experience in law enforcement, the reported assault, and the location in a high-crime area, supported the reasonableness of the officers' pat-down in this case. *See, e.g.*, *Commonwealth v. Taylor*, 771 A.2d 1261, 1269 (Pa. 2001) (reasonable suspicion to conduct *Terry* frisk where defendant fumbled under his apron and reached for his pocket despite officers' "repeated warnings not to move"); *Bozeman*, 205 A.3d at 1275–76 (reversing denial of suppression motion where court discounted officers' level of suspicion based on, *inter alia*, defendant's "nervous blading movements" and resulting inferences their experience led them to draw); *Commonwealth v. Thorne*, 191 A.3d 901, 906 (Pa. Super. 2018) (defendant's presence in high-crime area, "dipping

movements" and "lunging" toward floor and center console of his car, and refusal to exit car sufficient to conclude frisk was reasonable); ***Commonwealth v. Mack***, 953 A.2d 587, 590 (Pa. Super. 2008) ("reaching movements" toward back seat of car and waistband as officer approached, observation of defendant's nervousness, time of day, and lack of identification sufficient to justify ***Terry*** frisk).  Therefore, the trial court did not err in finding the officers' suspicion that Z.X.F.M. was armed and dangerous reasonable.

We conclude the officers had reasonable suspicion both to detain and frisk Z.X.F.M.  Accordingly, the trial court properly denied suppression, and we, therefore, affirm the dispositional order.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 2/6/2026