J-S55038-20

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| v. | : | |
| DARNELL REED-YOUNG | : | |
| Appellant | : | No. 1678 WDA 2019 |

Appeal from the Judgment of Sentence Entered October 15, 2019
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s):  CP-02-CR-0009996-2018

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| v. | : | |
| DARNELL REED-YOUNG | : | |
| Appellant | : | No. 1679 WDA 2019 |

Appeal from the Judgment of Sentence Entered October 15, 2019
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s):  CP-02-CR-0009995-2018

BEFORE:   BOWES, J., McCAFFERY, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                FILED JANUARY 08, 2021

Appellant, Darnell Reed-Young, appeals from the judgment of sentence of four to eight years of confinement followed by five years of probation, which was imposed after his convictions at a bench trial for:  one count of persons not to possess, use, manufacture, control, sell or transfer firearms; three

_____

[*] Retired Senior Judge assigned to the Superior Court.

counts of knowingly or intentionally possessing a controlled or counterfeit substance by a person not registered; three counts of manufacture, delivery, or possession with intent to manufacture or to deliver a controlled substance by a person not registered ("PWID"); one count of possession of a small amount of marihuana; one count of use of or possession with intent to use drug paraphernalia; one count of driving while operating privilege is suspended or revoked; and one count of duties at stop sign.[1]  We affirm.

> [A]s of July 12[, 2018], City of Pittsburgh Narcotics police detectives were engaged in surveillance of [Appellant]'s residence . . .[2] in response to complaints for drug activity being initiated out of that house [earlier that month.  N.T., 5/28/2019, at 5.] . . . [P]ursuant to that investigation, surveillance was set up on that house.  [Id. at 6.]  Prior to the date of July 12th, but close in time, numerous individuals were seen visiting that particular residence. A high volume of people were coming in and out of the residence staying only an average of two to three minutes before leaving the area.

N.T., 7/17/2019, at 5.[3]

_____

[1] 18 Pa.C.S. § 6105(a)(1), 35 P.S. § 780-113(a)(16), (30), (31), and (32), and 75 Pa.C.S. §§ 1543(a) and 3323(b), respectively.

[2] We have chosen to remove the address of Appellant's residence wherever it appears in the record in order to protect the privacy of any other individuals who reside at that location.  There is no issue in this case as to whether Appellant, in fact, lived in that home.

[3] The trial court did not file an opinion "[d]ue to the [c]ourt's unavailability and the unforeseeable nature of its duration[.]"  Letter from the Honorable Jill E. Rangos, Administrative Judge, to Nicholas Corsetti, Deputy Prothonotary (March 19, 2020).  However, the trial court entered its findings of fact on the record in open court following the suppression hearing, discussed below, and prior to the bench trial on July 17, 2019.  N.T., 7/17/2019, at 4-10.  We cite

Following his arrest, on December 17, 2018, Appellant filed a suppression motion. On May 28, 2019, the trial court held a hearing on the motion, at which --

> testimony was taken from three separate detectives from the City of Pittsburgh [Police Department] and the Probable Cause Affidavit that attended to a search warrant for [Appellant]'s residence . . . was submitted for the [trial c]ourt's consideration. . . . Detective Andrew Shipp was the first detective to testify. He indicated that pursuant to his surveillance on July 12th he observed an associate of [Appellant] named Dontell[4] Harper walking up to the front door of that residence. [N.T., 5/28/2019, at 6.] Detective Shipp indicated that it was apparent to him, based on his training and experience, that there was a handgun concealed in Mr. Harper's right, front shorts pocket. [Id.] Mr. Harper first went to the front door, waited momentarily, then removed himself from sight to the rear of the house. [Id.]
>
> After a period of a few minutes, Dontell Harper reappears in the front of the house in the line of sight of Detective Shipp; however, at this point, the gun was no longer concealed in his right, front shorts pocket and it was not visible to the officer. [Id.] Detective Shipp indicated he shared that information with the other detectives who were involved in this investigation. [Id. at 7.]
>
> The next day, on July 13th, Detective Shipp, from a position of surveillance, saw [Appellant] as well as Dontell Harper, leave the residence and get into a white Kia. [Id.] At that point, he radioed Detective [Mark] Kneebone to follow the car and he also radioed out to Detective [Scott] Love that he had observed the gun in Dontell Harper's pocket on July 12th but did not indicate that he could see any kind of gun on the 13th. [Id.]
>
> Subsequently, after that radio transmission went out, Detective Kneebone, who was circling the area in another unmarked car

_____

thereto for the facts and procedural history referenced in this decision, unless otherwise noted. Bracketed citations within these block quotations are to the notes of testimony from the suppression hearing itself on May 28, 2019.

4 Harper's first name is alternatively spelled as "Dontay," "Donte," or "Dontell" throughout the record.

decided to follow the white Kia to see if there[ was] any suspicious activity that would bear out upon the narcotics investigation and also he testified that pursuant to his experience and training and education he wanted to know where the two of them were going, because it might lead the investigation in a different direction. [Id. at 16.]

He observed the white Kia failed to stop completely at a stop sign, and armed with the information that one or more of the occupants may be armed and dangerous, he conducted a traffic stop. [Id.] He found that [Appellant] in this case was driving. He observed [Appellant] was sweating, he appeared to be nervous. But [Appellant] indicated that he had no driver's license but volunteered both rental documents as well as a Pennsylvania Identification Card.

Detective Kneebone indicated that at that point, he was on high alert already because of the information he had received about the weapon on Mr. Harper the day before, and that he observed both [Appellant] and Mr. Harper, the front seat passenger, moving around inside of the car and whispering amongst themselves. [Id. at 18.] He also testified that although he did not presently remember whether he knew which of the two individuals supposedly was armed and dangerous, he definitely knew that he was put on alert that one of them or both of them could be armed and dangerous. . . .

Detective Scott Love testified third. He indicated that upon his arrival at the intersection where the traffic stop had taken place, Detective Kneebone was already present. [Id. at 23.] He also observed that [Appellant] was very nervous, he was sweating, and that [Appellant] would not make eye contact with Detective Love. He also noted an open can of beer in the car and took note of the fact that [Appellant] was breathing very heavily. He confirmed that the [Appellant] was an unlicensed driver, via radio. He recognized immediately, Mr. Harper, the passenger of the car, as the individual he had seen the day before with the gun concealed in his shorts pocket.

So concerned for officer's safety, quick pat downs were effectuated on both individuals. [Id. at 25.] Detective Love testified, that once he palpated the area of [Appellant]'s buttocks,

- 4 -

he immediately identified a brick of heroin in that area. [Id.[5]] He testified, he had felt numerous bricks of heroin hundreds of times before. He described it as a distinctive rectangular shape. He specifically testified that he did not need to manipulate what he felt in order to recognize it for what it was immediately. . . . [O]ther bundles were extracted from [Appellant]'s person, which did require manipulation but the initial identification did not require any manipulation.

Based upon that traffic stop, based upon the observations that were collected during the ongoing investigation and the surveillance, based upon the heroin that was recovered from [Appellant]'s person, based upon the fact that, in the detective's training, experience, and education, drug dealers often store their warehouse of product in their residence, a search warrant was applied for. [Id. at 8.] It was approved by a magistrate in good standing. The search warrant was effectuated upon the house[.]

N.T., 7/17/2019, at 4-10. The affidavit of probable cause affixed to the search warrant was executed by Detective Shipp and included a summary of his training and experience, as well as the following:

Within the last 30 days I received a complaint of possible narcotics sales taking place out of [Appellant's residence.] After receiving this information I began to conduct surveillance of the residence. . . . [O]bserved during the hours of surveillance conducted of this residence was a heavy amount of vehicle traffic. Vehicles would frequently pull up and one or more of the occupants would then exit the vehicle and enter [the residence] where they would remain for a very brief period of time approximately 2-5 minutes then they would exit the residence return to their vehicles and leave the area. This type of behavior of very short visits from numerous people is very consistent with narcotics trafficking out of a residence[.]

*  *  *

_____

[5] Detective Love's exact testimony was: "I immediately felt what I knew to be packaged heroin. It was in a brick form. I grabbed a hold of it. When I grabbed a hold of it, I could feel there were several other bundles of heroin." N.T., 5/28/2019, at 25.

[Detective Love] conducted a pat down for weapons of [Appellant] during which time he felt what he immediately recognized to be packaged heroin located in his buttocks area. Detective Love then recovered a clear knotted plastic bag containing 1 sealed brick and 3 bundles of heroin stamped "Tuna Fish" in blue ink. . . .

Through my training and experience, I know that it is common for drug dealers to maintain a supply or stash of drugs at their residence or place where they conduct business, to supply to their customers[.]

Application for Search Warrant and Authorization, 7/15/2018, Affidavit of Probable Cause, at 1-2. The search warrant also included "Attachment A," listing "ITEMS TO BE SEARCHED FOR AND SEIZED":

(1)    Heroin, cocaine and crack cocaine.

(2)    Any paraphernalia, packaging & processing materials and items associated with the selling, distribution, and use of heroin, cocaine and crack cocaine.

(3)    Any monies derived from selling heroin, cocaine and crack cocaine.

(4)    Any items that may establish proof of residency and/or occupancy.

(5)    Any items that may establish ownership and/or control or access to heroin cocaine, crack cocaine, drug paraphernalia associated with heroin cocaine, crack cocaine, and monies derived from selling the above listed narcotics.

(6)    Any and all electronic devices (i.e. cellular phones, tablets, laptop computers, computers, scanners) and the contents thereof believed used to facilitate the selling of heroin cocaine, crack cocaine, or that could verify and corroborate the selling of heroin cocaine and crack cocaine.

(7)    Any and all documents or financial records which could reveal information concerning proceeds obtained through illicit drug trafficking.

(8)    Any and all firearms & ammunition.

(9)    Any and all safes or lock boxes that may be used to conceal or store heroin, cocaine, crack cocaine, and currency.

Id., Attachment A.

Following the hearing on the suppression motion, "[d]efense requested permission to brief the issue. The [trial c]ourt . . . had the benefit of both the brief and the reply brief[.] . . . Consistent with the Rules of Criminal Procedure, the [trial c]ourt . . . enter[ed] its findings of fact and conclusions of law" on the record. N.T., 7/17/2019, at 4-5. Then,

> based upon an evaluation of all of the testimony, all of the evidence, and the four corners of the search warrant, the [trial c]ourt [found] that there was ample probable cause and reasonable suspicion over the course of this case. Both on the 13th to justify the search incident to the traffic stop as well as to justify the granting of the search warrant which contained the information about the traffic stop as well as everything else.

> So based upon those findings of facts and conclusions of law the suppression motion [wa]s denied.

Id. at 10-11.

Appellant subsequently "move[d] to incorporate that testimony and proceed to a nonjury trial[,]" and the trial court agreed. Id. at 11. The Commonwealth then presented additional testimony. Detective Shipp was recalled to the stand and testified about the execution of the search warrant as follows:

> While conducting the search of the residence, $1,443 was recovered from [Appellant]'s person. Along with an additional $1700 was recovered from his bedroom closet. Also inside of the closet was a Kel-Tec firearm .380 that was recovered from the top shelf. There was a small amount of marijuana recovered from the T.V. stand, one with a digital scale. . . . There was an additional

J-S55038-20

empty brick wrapper recovered from the T.V. stand in the living room.

Id. at 27.

In addition, the Commonwealth presented the testimony of Detective Andrew Miller of the City of Pittsburgh Police Department. Id. at 39. The parties stipulated that Detective Miller was an expert in narcotics trafficking. Id. at 38-39. Detective Miller testified that the items recovered from the residence were indicative of drug trafficking. Id. at 40. He explained that the firearm recovered from the residence would have been used to protect the ongoing drug trafficking enterprise and the money generated from drug sales. Id. at 41.

Appellant was thereafter convicted of the aforementioned charges. He was sentenced on October 15, 2019, and Appellant filed this timely direct appeal on November 14, 2019.[6]

Appellant presents the following issues for our review:

I. Did the trial court err in denying [Appellant]'s motion to suppress where the detectives searched [Appellant] without reasonable suspicion, based on specific and articulable facts, to believe he was presently armed and dangerous?

II. Did the trial court err in denying [Appellant]'s motion to suppress where the Commonwealth failed to establish that any of the requirements of the plain-feel doctrine had been met?

_____

[6] Appellant filed his statement of errors complained of on appeal on December 13, 2019. As noted above, the trial court did not enter an opinion.

III.    Did the trial court err in denying [Appellant]'s motion to suppress where the search warrant was issued based on information that failed to establish probable cause?

IV.    At CC 2018-0996 (case one),[7] did the Commonwealth provide insufficient evidence to convict [Appellant] of [PWID], where the Commonwealth failed to prove, beyond a reasonable doubt, that [Appellant] possessed either substance with the intent to deliver?

Appellant's Brief at 7 (suggested and trial court's answers omitted).

### Suppression

Appellant's first three issues contend that the trial court erred by denying his suppression motion.

> In reviewing the denial of a suppression motion, our role is to determine whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct.  Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole.  Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous.  Where, as here, the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts.  Thus, the conclusions of law of the courts below are subject to our plenary review.

Commonwealth v. Yim, 195 A.3d 922, 926 (Pa. Super. 2018) (citations and internal brackets omitted).  Our scope of review from a suppression ruling is

_____

[7] One of Appellant's PWID convictions was at Docket Number CP-02-CR-0009995-2018; his other two PWID convictions were at Docket Number CP-02-CR-00009996-2018.

- 9 -

limited to the evidentiary record created at the suppression hearing. Commonwealth v. Fulton, 179 A.3d 475, 487 (Pa. 2018).

Terry Stop

Appellant's first basis for challenging the denial of his suppression motion is an argument that the detectives searched him "without reasonable suspicion, based on specific and articulable facts, to believe that he was presently armed and dangerous." Appellant's Brief at 22. He continues:

> Specifically, the detectives had no evidence that [Appellant] possessed a firearm. The Commonwealth presented evidence at the suppression hearing that Mr. Harper, the front seat passenger in the vehicle, was seen with a firearm the previous day at [Appellant's] residence; however, the following day, neither man was seen carrying a firearm prior to the traffic stop.

Id. (emphasis in original). He consequently asserts that the detectives' actions did "not comport with the Terry standard for reasonable suspicion that criminal activity is afoot." Id. at 27. According to Appellant, Detective Love lacked the necessary reasonable suspicion to believe that he was armed and dangerous and, accordingly, improperly conducted the pat-down, resulting in the discovery of heroin. Id. at 27-28.

A "Terry stop" is "[a]n investigative detention [that] occurs when a police officer temporarily detains an individual by means of physical force or a show of authority for investigative purposes." Commonwealth v. Barber, 889 A.2d 587, 592 (Pa. Super. 2005). "Such a detention constitutes a seizure of a person and thus activates the protections of the Fourth Amendment and the requirements of Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d

889 (1968)." Barber, 889 A.2d at 592. It must be supported by "reasonable suspicion that the person seized is then engaged in unlawful activity." Id. at 593.

Additionally, "[i]f, during the course of a valid investigatory stop, an officer observes unusual and suspicious conduct on the part of the individual which leads him to reasonably believe that the suspect may be armed and dangerous, the officer may conduct a pat-down of the suspect's outer garments for weapons." Commonwealth v. Bozeman, 205 A.3d 1264, 1274 (Pa. Super.), appeal denied, 217 A.3d 809 (Pa. 2019).

According to the evidentiary record created at the suppression hearing in the current action, during his surveillance of Appellant's residence conducted the day prior to the traffic stop, Detective Shipp observed that Harper had a firearm concealed in his right front pocket when he entered Appellant's home but did not have it on his person when he left. N.T., 5/28/2019, at 6; N.T., 7/17/2019, at 6. Consequently, it was reasonable to believe that Harper could have given the firearm to Appellant, perhaps in exchange for drugs. The very next day, while conducting surveillance, Detective Shipp observed Appellant and Harper leave Appellant's residence together and enter the same automobile. N.T., 5/28/2019, at 7; N.T., 7/17/2019, at 6. Detective Kneebone testified that, after they were pulled over for the traffic stop and while police were approaching the vehicle, Appellant and Harper were seen moving around inside the car. N.T., 5/28/2019, at 18; N.T., 7/17/2019, at 8. Ergo, this "unusual and suspicious

conduct" could have reasonably caused the detectives to suspect that Appellant and Harper were searching for, pulling out, or loading a firearm. Bozeman, 205 A.3d at 1274. When police finally reached the vehicle, Detectives Kneebone and Love noted that Appellant appeared to be nervous and was breathing very heavily and sweating, and would not make eye contact; these factors thereby also caused police to suspect that Appellant possessed some sort of contraband, including a weapon, in his vehicle or on his person. N.T., 7/17/2019, at 7-8. Hence, we agree that the Commonwealth's evidence established that police reasonably suspected that Appellant was armed and dangerous, thereby justifying the search of his person. Appellant's first suppression challenge therefore is meritless.

<u>Plain Feel Doctrine</u>

Appellant next argues that the trial court improperly denied his suppression motion, "because none of the requirements of the plain feel doctrine had been met." Appellant's Brief at 31. He continues that the Commonwealth "failed to establish that the seizure of the substances was permissible under the plain feel doctrine." Id.

> [A]n officer may . . . properly seize non-threatening contraband detected through the sense of touch during a protective frisk for weapons. Minnesota v. Dickerson, 508 U.S. 366, 373, 113 S.Ct. 2130, 2136, 124 L.Ed.2d 334 (1993). In so holding, the Court adopted what it characterized as the plain feel doctrine, explaining it as a corollary to the plain view doctrine. See id. at 376–77, 113 S.Ct. at 2137–38. In the federal arena, plain feel applies to validate a seizure of contraband other than a weapon where an officer is lawfully in a position to detect it; its incriminating nature is immediately apparent from its tactile

impression; and the officer has a lawful right of access to the object.

Commonwealth v. Zhahir, 751 A.2d 1153, 1158–59 (Pa. 2000).

In the current appeal, the officer was lawfully in a position to detect the drugs, because he was conducting a weapons frisk based upon a reasonable suspicion for the reasons discussed above. See id. at 1159. Second, according to Detective Love's testimony, its incriminating nature was immediately apparent to him, as he immediately identified it a brick of heroin, because he had felt hundreds of bricks of heroin during his experience as a police officer and recognized its distinctive rectangular shape. N.T., 5/28/2019, at 25; N.T., 7/17/2019, at 9; see Zhahir, 751 A.2d at 1159. Finally, Detective Love did not need to manipulate what he felt in order to identify it and thus had a lawful right of access to the object. N.T., 7/17/2019, at 9; see Zhahir, 751 A.2d at 1159. The plain feel doctrine therefore was satisfied, and Detective Love properly seized the non-threatening contraband – i.e., the drugs – that he had detected through his sense of touch during the protective frisk of Appellant's person for weapons. Zhahir, 751 A.2d at 1158. Appellant's second challenge to the denial of his suppression motion thereby also merits no relief.

## Search Warrant

Appellant's final suppression challenge is that "[t]he trial court erred in denying the motion to suppress because the search warrant [for Appellant's residence] was issued based on information that failed to establish probable cause." Appellant's Brief at 44. He continues:

> The issue of probable cause for the search in [Appellant]'s case involves two inquiries. First, this Court must determine whether information from the traffic stop conducted on July 13, 2018, should be included in the determination of whether officers had probable cause to search the residence. . . . Specifically, without the information gained from the traffic stop, there is not enough information to find sufficient probable cause to issue a search warrant for the . . . residence.
>
> * * *
>
> Second, even if this Honorable Court finds that the information from the traffic stop should be included in the determination of probable cause, the facts contained in the affidavit of probable cause are insufficient. . . . [T]he affidavit still fails to provide enough specificity related to the items that would be found within the residence. . . . There was no other evidence of drugs or other contraband presented to support Detective Shipp's affidavit of probable cause.

Id. at 45-47.

We have already determined that the information from the traffic stop was properly obtained, for the reasons discussed above. We thus only need address whether the facts asserted in the affidavit of probable cause were sufficient to support the search warrant.

"When considering whether an anticipatory search warrant was supported by probable cause under the Fourth Amendment of the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution, judicial review is confined to the averments contained within the four corners of the affidavit of probable cause." Commonwealth v. Wallace, 42 A.3d 1040, 1048 (Pa. 2012) (footnotes omitted); see also Commonwealth v. Rapak, 138 A.3d 666, 671 (Pa. Super. 2016) ("[i]n determining whether the

warrant is supported by probable cause, the magistrate may not consider any evidence outside the four-corners of the affidavit").

The search warrant stated that multiple bundles of heroin were found on Appellant's person; the large quantity of heroin on his person suggested the drugs were not for person use. Application for Search Warrant and Authorization, 7/15/2018, Affidavit of Probable Cause, at 2. Furthermore, although we acknowledge that "probable cause to believe that a man has committed a crime on the street does not necessarily give rise to probable cause to search his home[,]" Wallace, 42 A.3d at 1049–50, the affidavit of probable cause included averments linking Appellant drug-dealing to his residence in order to justify the search of the residence. Specifically, the affidavit averred that police had received a report of narcotics sales at Appellant's residence and that surveillance revealed numerous people coming in and out of the residence at all hours but only staying a few minutes. Application for Search Warrant and Authorization, 7/15/2018, Affidavit of Probable Cause, at 1. Furthermore, in the affidavit, Detective Shipp asserted that, in his experience, dealers often store drugs in their homes. Id. at 2.

Additionally, as for Appellant's claim that the application for the search warrant "fail[ed] to provide enough specificity related to the items that would be found within the residence[,]" Appellant's Brief at 46, this claim is belied by the fact that "Attachment A" to the application for the search warrant enumerates nine categories of items that Detective Shipp and his team

believed could be found within Appellant's residence. Application for Search Warrant and Authorization, 7/15/2018, Attachment A.

For these reasons, we find that Appellant's final suppression claim is without merit. Thus, his challenge to the denial of his suppression motion fails in its entirety.

### Sufficiency of the Evidence

Last, Appellant challenges the sufficiency of the evidence to support two of his convictions for PWID. Appellant's Brief at 50. Appellant contends that "the Commonwealth failed to prove beyond a reasonable doubt that [he] possessed the substances with the intent to deliver." Id. He continues: "One of the most noteworthy factors in the case at bar is [Appellant]'s demeanor. According to Detective Love, [Appellant] fully complied with the detectives' investigation." Id. at 51-52 (citing N.T., 5/28/2019, at 25).

> This Court's standard for reviewing sufficiency of the evidence claims is as follows:
>
>> We must determine whether the evidence admitted at trial, and all reasonable inferences drawn therefrom, when viewed in a light most favorable to the Commonwealth as verdict winner, support the conviction beyond a reasonable doubt. Where there is sufficient evidence to enable the trier of fact to find every element of the crime has been established beyond a reasonable doubt, the sufficiency of the evidence claim must fail.
>>
>> The evidence established at trial need not preclude every possibility of innocence and the fact-finder is free to believe all, part, or none of the evidence presented. It is not within the province of this Court to re-weigh the evidence and substitute our judgment for that of the fact-finder. The Commonwealth's burden may be met by wholly circumstantial evidence and any doubt about the

- 16 -

> defendant's guilt is to be resolved by the fact-finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.
>
> Commonwealth v. Rodriguez, 141 A.3d 523, 525 (Pa.Super. 2016) (quoting Commonwealth v. Tarrach, 42 A.3d 342, 345 (Pa.Super. 2012)).

Commonwealth v. Izurieta, 171 A.3d 803, 806 (Pa. Super. 2017) (internal brackets omitted).

> To sustain a conviction for PWID, the Commonwealth must prove both the possession of the controlled substance and the intent to deliver the controlled substance. Moreover, [w]ith regard to the intent to deliver, we must examine the facts and circumstances surrounding the possession. . . . [F]actors to consider when determining whether a defendant intended to deliver a controlled substance include the manner in which the controlled substance was packaged, the behavior of the defendant, the presence of drug paraphernalia, and the sums of cash found in possession of the defendant. The final factor to be considered is expert testimony. Expert opinion testimony is admissible concerning whether the facts surrounding the possession of controlled substances are consistent with an intent to deliver rather than with an intent to possess it for personal use.

Commonwealth v. Bernard, 218 A.3d 935, 943 (Pa. Super. 2019) (citations and internal quotation marks omitted) (some additional formatting).

For the first factor, "the manner in which the controlled substance was packaged," id., through a pat-down search that occurred during the vehicle stop in this case, Detective Love felt what was immediately known to him to be a packaged brick of heroin in Appellant's buttocks area. N.T., 7/17/2019, at 9. When Detective Love grabbed the brick, he could feel several other bundles of heroin. N.T., 5/28/2019, at 25.

As for "the behavior of the defendant," Bernard, 218 A.3d at 943, although Appellant was cooperative, as noted in his brief, Appellant's Brief at 51-52, Detectives Kneebone and Love both testified that Appellant appeared to be nervous, was breathing heavily and sweating, and would not make eye contact. N.T., 7/17/2019, at 7-8.

Upon execution of the search warrant, the detectives found "the presence of drug paraphernalia" in Appellant's residence. Bernard, 218 A.3d at 943. Packaging materials and a scale were recovered from a television stand in the residence. N.T., 7/17/2019, at 27.

Police also found large "sums of cash" in Appellant's possession when they executed the warrant. Bernard, 218 A.3d at 943. Specifically, Detective Shipp testified that $1,443.00 was recovered from Appellant's person during the search and $1,700.00 was recovered from his bedroom closet, for a total of $3,143. N.T., 7/17/2019, at 27.

"The final factor to be considered is expert testimony." Bernard, 218 A.3d at 943. As an expert in narcotics trafficking, Detective Miller testified that the items recovered from the residence were indicative of drug trafficking. N.T., 7/17/2020, at 40. He explained that, for example, the firearm recovered from the residence would have been used to protect the ongoing drug trafficking enterprise and the money generated from drug sales. Id. at 41.

Accordingly, pursuant to the Bernard factors, the evidence admitted at trial concerning the facts and circumstances surrounding the possession was

sufficient to support Appellant's convictions for PWID. 218 A.3d at 943; see also Izurieta, 171 A.3d at 806.

\*    \*    \*

Based on the foregoing, Appellant is not entitled to relief. Thus, we affirm his judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 1/8/2021