**[J-6-2021] [MO: Mundy, J.]**

**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

| | |
|---|---|
| IN THE INTEREST OF: T.W., A MINOR | : No. 22 EAP 2020 |
| APPEAL OF : T.W. | : |
| | : Appeal from the Judgment of |
| | : Superior Court entered on February |
| | : 4, 2020 at No. 2390 EDA 2018 |
| | : affirming the Order entered on July |
| | : 10, 2018 in the Court of Common |
| | : Pleas of Philadelphia County, |
| | : Juvenile Division, at No. CP-51-JV- |
| | : 0001105-2018. |
| | : |
| | : ARGUED:  March 9, 2021 |

**CONCURRING OPINION**

**JUSTICE DOUGHERTY**                              **DECIDED:  October 20, 2021**

This case requires that we determine the applicable standard, under the Fourth Amendment to the United States Constitution, "for when police may conduct an additional more intrusive search of a pocket following a pat-down for weapons[.]"  *In the Interest of T.W.*, 237 A.3d 416 (Pa. 2020) (*per curiam*).  The answer to this question entails several parts.  I join the majority's opinion in full because it correctly resolves the central issue of dispute between the parties and holds a police officer conducting a lawful *Terry*[1] frisk may remove an object from within a suspect's clothing when there is reasonable suspicion that the object is a weapon.  Majority Opinion at 17.  I write separately to further elucidate my views on those related, outstanding issues the majority does not expressly resolve.

---

[1] *Terry v. United States*, 392 U.S. 1 (1968).

# I. Background

My colleagues discuss the facts at significant length, but I repeat them again here because there is strong disagreement as to how to apply the law to them.

On June 19, 2018, Officers Grant and Heeney were in uniform and on patrol in a marked police car near the 2200 block of North 20th Street in Philadelphia, Pennsylvania. At approximately 4:15 a.m., they observed two vehicles, a silver Toyota and a green Chevy, traveling northeast on Sedgley Avenue. The silver Toyota made a sharp illegal U-turn, and the green Chevy, which was following close behind, proceeded to do the same. As the officers started making the U-turn to initiate a stop of the vehicles, they observed that both vehicles began to travel at a high rate of speed. The officers activated their lights and sirens and followed the vehicles as they sped through the streets of Philadelphia, disregarding several red lights.

As the vehicles made a sharp left turn onto Dauphin Street, the Chevy crashed and the two men inside alighted and fled on foot. The officers exited their patrol car and gave chase, but soon lost sight of the men. The officers then came upon the silver Toyota at a red light at 20th Street and Susquehanna Avenue and, without the protection of their police car, effectuated a vehicle stop on foot. The officers found three people in the Toyota — a female driver, a female passenger, and appellant, who was sitting in the back seat on the driver's side. As Officer Grant instructed the three occupants to roll down the windows and produce identification, he observed appellant "blade his body and start to reach into his pockets." N.T. Suppression Hearing, 7/10/18 at 13. More specifically, appellant "turned his left shoulder away" from the officer as "[h]is hands were going into his pockets." *Id.* at 14.

Officer Grant repeatedly asked appellant to stop turning his body away from him and reaching into his pockets, but appellant refused to comply. Based on appellant's actions and the fact Officer Grant knew the location of the stop to be a high-crime area, Officer Grant was concerned appellant "could have had a weapon." *Id.* Indeed, Officer Grant testified that, just three days prior, five people were shot at the intersection where the Chevy crashed and, further, that he had recovered firearms during past traffic stops in the 22nd Police District — the same district where this stop occurred and where Officer Grant had been serving as a police officer for two years.

In light of these facts, Officer Grant opened the car door and asked appellant to step out of the vehicle for the purpose of conducting a safety frisk. Once appellant was outside, Officer Grant frisked him with an open-handed pat-down of his pants and felt a large, hard object in his front left pants pocket. Officer Grant could not affirmatively identify what the object was but was concerned based on his training, experience, and knowledge of "the recent spate of violent incidents in this area" that the large, hard object "was a weapon or firearm." *In the Interest of T.W.*, 2020 WL 551354, at *3 (Pa. Super. Feb. 4, 2020) (unpublished memorandum), *citing* N.T. Suppression Hearing, 7/10/18 at 17-19, 26.[2] As a result, he reached into appellant's left pants pocket and removed the

---

[2] On cross examination, Officer Grant noted he could not recall the exact size of the object, but agreed it was approximately the size of a Nyquil bottle. *In the Interest of T.W.*, 2020 WL 551354 at *3, *citing* N.T. Suppression Hearing, 7/10/18 at 21. Justice Donohue states she does not suggest Officer Grant knew what the object was before he removed it, *see* Concurring and Dissenting Opinion at 11 n.7 (Donohue, J.), but I respectfully note her discussion of the record seemingly implies Officer Grant may have arrived at that conclusion prior to retrieving and examining it, *see id.* ("Officer Grant did in fact dispel a belief [appellant] was armed and dangerous if he determined that the item felt like a bottle of Nyquil"); *id.* at 13 ("Officer Grant agreed that the item he removed from [appellant]'s pocket was comparable to a Nyquil bottle.") (citation omitted). There is absolutely no

object, which he then discovered was actually a bottle labeled "Promethazine[.]" *Id.* Officer Grant placed appellant under arrest and, during a search incident to arrest, recovered an amber prescription pill bottle containing two Oxycodone pills from inside another one of appellant's pants pockets.

Appellant was charged with possession of a controlled substance. At a juvenile adjudication hearing, he moved to suppress the physical evidence Officer Grant had recovered from his person and, in order to meet its burden of establishing "that the challenged evidence was not obtained in violation of" appellant's rights, Pa.R.Crim.P. 581, the Commonwealth called Officer Grant, who testified to the facts detailed above. The juvenile court found Officer Grant credible and denied suppression. The court reasoned the officer "acted properly" because his actions were undertaken in an effort to protect the other passengers of the car as well as the officers on the scene. *See* N.T. Suppression Hearing, 7/10/18 at 33*; id.* at 36 (explaining that "[i]f there had been a weapon in [appellant]'s pocket[ ]" all "could have been in danger"). Appellant seemed to agree with this observation, though not with the constitutionality of the extent of the search ultimately conducted. *See id.* at 28-29 (conceding Officer Grant's decision to conduct a frisk in the first place demonstrated "prudent work" since "what [he] was trying to do was make sure that everybody was safe during the entirety of this stop").

---

evidence suggesting Officer Grant believed the large, hard object he felt during the pat-down was a "medicine bottle" prior to removing it from appellant's pocket. Rather, Officer Grant testified that although he could not determine what the object was, he could not rule out the possibility it was a weapon. *See* N.T. Suppression Hearing, 7/10/18 at 26.

## II. Analysis

Like my colleagues in partial dissent, I see several interrelated facets to the issue upon which we granted review. The one primarily disputed by the parties is the simplest to resolve: what quantum of proof governs a *Terry* encounter as a general matter? The Court unanimously agrees the answer to this question is reasonable suspicion, not probable cause. But several questions remain, including: whether, to be reasonable, a more intrusive search of a suspect's pocket requires additional factual support beyond those factors supporting the initiation of the frisk; and whether an officer conducting such a search must use the least intrusive means available. Unlike the majority, I would not avoid confronting these issues.[3]

### A. *Terry* and the Reasonable Suspicion Standard

The majority's opinion goes a long way in "clarify[ing] the issue left unresolved by this Court's split decision in *Commonwealth v. Taylor*, 771 A.2d 1261 (Pa. 2001), relating to the standard for when police may conduct an additional more intrusive search of a pocket following a pat-down for weapons." *In the Interest of T.W.*, 237 A.3d 416 (Pa. 2020). Most importantly, the majority correctly resolves that, "[p]ursuant to *Terry* . . ., a police officer may remove an object from within a suspect's clothing under the reasonable suspicion that the object is a weapon." Majority Opinion at 17. However, as the positions forwarded by my colleagues in partial dissent prove, disagreement remains regarding how that standard should apply in practice. Thus, I would more clearly define precisely what is required under the standard.

---

[3] The majority contends these subsidiary issues are waived or beyond the scope of the question on which we granted review. *See* Majority Opinion at 21-22 n.9. In my respectful view, however, they are adequately encompassed within the question presented.

The United States Supreme Court recently confirmed that reasonable suspicion has always been a "less demanding" standard that "can be established with information that is different in quantity or content than that required to establish probable cause." *Kansas v. Glover*, ___ U.S. ___, 140 S.Ct. 1183, 1188 (2020), *quoting Alabama v. White*, 496 U.S. 325, 330 (1990). Although reasonable suspicion requires more than "'a mere 'hunch,''" it is still "considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Id.* at 1187, *quoting Navarette v. California*, 572 U.S. 393, 397 (2014).

As the *Glover* Court explained, reasonable suspicion "'falls considerably short' of 51% accuracy," *id.* at 1188, *quoting United States v. Arvizu*, 534 U.S. 266, 274 (2002), and "'depends on the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act,'" *id.*, *quoting Navarette*, 572 U.S. at 402 (emphasis omitted). Accordingly, "[c]ourts 'cannot reasonably demand scientific certainty . . . where none exists[,]'" and "must permit officers to make 'commonsense judgments and inferences about human behavior.'" *Id.*, *quoting Illinois v. Wardlow*, 528 U.S. 119, 125 (2000); *see also Navarette*, 572 U.S. at 403 ("we have consistently recognized [ ] reasonable suspicion need not rule out the possibility of innocent conduct") (internal quotations and citation omitted). Of course, in making such judgments and drawing such inferences, officers must weigh the totality of the circumstances, including "the presence of additional facts [that] **might dispel reasonable suspicion**." *Glover*, 140 S.Ct. at 1191, *citing Terry*, 392 U.S. at 28 (emphasis added).

The word "dispel" is critical. Under *Terry*, if an officer observes something inconsistent with his or her belief the suspect is armed and dangerous such that it "might

dispel reasonable suspicion[,]" the officer may not proceed with the *Terry* frisk. *Glover*, 140 S.Ct. at 1191, *citing Terry*, 392 U.S. at 28; *see also Minnesota v. Dickerson*, 508 U.S. 366, 373, 378 (1993) (if, during the *Terry* stop, the officer concludes the object is not a weapon, the frisk must cease). Viewed another way: If an officer has reasonable suspicion to conduct a *Terry* frisk, that reasonable suspicion remains unless and until the officer's belief that the object may be a weapon is negated. Thus, if the officer continues to believe the item **may be a weapon**, or **cannot confirm it is not a weapon** — and that belief is objectively reasonable based on the information known at the time — the officer has reasonable suspicion to proceed with a more invasive search to confirm its identity and protect him or herself and others. *See Terry*, 392 U.S. at 24 (concluding officers have "the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm"); *id.* at 29 (noting a search initiated to confirm whether an individual is armed and dangerous must be "confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer").

### B. The Permissible Scope of a More Intrusive Search

Moreover, I would consider the permissible scope of the additional, more intrusive search that an officer may conduct when, following an initial pat-down, there remains a reasonable suspicion that the suspect may be armed and dangerous. The majority correctly permits an officer to directly search the area where the potentially dangerous item is believed to be following an inconclusive pat-down, but Justices Donohue and Wecht would impose a "least intrusive means" limitation. *See* Concurring and Dissenting Opinion at 1 (Donohue, J.) ("the Fourth Amendment demands that an officer use the least

intrusive means to resolve any uncertainty"); Concurring and Dissenting Opinion at 12 (Wecht, J.) ("Generally . . ., a police officer must employ the least intrusive means reasonably available to determine whether the suspect is armed."). However, the Fourth Amendment does not require their proposed limitation, and moreover, it is patently impractical to apply it in these circumstances.

First, I note that, notwithstanding Justice Donohue's emphatic assertion to the contrary, reasonableness **is** the touchstone of **every** Fourth Amendment assessment, including those arising in the *Terry* context. Although Justice Donohue correctly observes the *Terry* Court, in defining the contours of a protective frisk, carefully weighed the competing interests of law enforcement safety and individual liberty, the Court certainly did not expressly address what is reasonable or direct what is required when an officer identifies an object he or she cannot conclude is not a weapon; the issue was simply not before the Court. Yet, *Terry* does provide useful guidance here, by instructing the appropriate inquiry is "whether [the search] was **reasonably** related in scope to the circumstances which justified the interference[.]" *Terry*, 392 U.S. at 20 (emphasis added). Central to this directive is an assessment of whether the officer's action — here, a more intrusive search following an initial, unilluminating pat-down — was objectively reasonable.

We have recognized as much in other *Terry*-related contexts. For example, in *Commonwealth v. Revere*, 888 A.2d 694 (Pa. 2005), we considered whether police were justified in "transporting a suspect a short distance in the absence of probable cause during the course of an investigative detention pursuant to *Terry*[,]" where exigent circumstances were present. *Revere*, 888 A.2d at 696. In concluding the officers'

movement of the suspect was reasonable, we were "persuaded that a hard and fast rule that would equate placing a suspect in a police vehicle and transporting him with an arrest requiring probable cause, in all instances, would be an arbitrarily crabbed view of *Terry*[.]" *Id.* at 706. We specifically noted "the [High] Court has explained that the 'central requirement' and the 'touchstone' of the Fourth Amendment is reasonableness[,]" which is "measured in objective terms by examining the totality of the circumstances[,]" and "eschew[s] bright-line rules, instead emphasizing the fact-specific nature of the reasonableness inquiry." *Id.* at 707 (citations omitted). To this end, we recognized "[t]he overwhelming weight of Fourth Amendment authority supports a degree of flexibility in the conduct of *Terry* investigative detentions[.]" *Id.* at 703. Thus, we held "allowing courts to engage in a totality of the circumstances analysis which accounts for exigencies arising during an investigatory detention is a function of the underlying reasonableness that must exist to justify any *Terry* stop," and suppression was not warranted.[4] *Id.* at 707.

---

[4] Justice Donohue correctly notes *Revere* is a case in which the reasonableness of the officers' actions was dependent upon the presence of exigent circumstances. *See* Concurring and Dissenting Opinion at 4 n.3 (Donohue, J.). While it is true exigent circumstances are not involved here, *Revere* is still instructive on the central issue of reasonableness. This is so because, when tasked with assessing the validity of an officer's actions during a lawful *Terry* stop, this Court turned to Fourth Amendment reasonableness standards to make that determination and directed that was the proper analysis. *See Revere*, 888 A.2d at 707. Other cases of the United States Supreme Court have instructed the same. *See, e.g.*, *United States v. Place*, 462 U.S. 696, 703, 709 n.10 (1983) (noting that, in applying *Terry* principles to a ninety-minute investigative detention of a suspect's luggage, courts must "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion[,]" and concluding a hard-and-fast time limit for a permissible *Terry* stop is not advisable in that it would "undermine the equally important need to allow authorities to graduate their responses to the demands of any particular situation"). That the present case is not on all fours with *Revere* is thus of no moment; what matters for present purposes is that *Revere* demonstrates how reasonableness is always the lodestar of any Fourth Amendment analysis, even in *Terry* cases.

*Revere* demonstrates what should be obvious: courts must assess the reasonableness of every search based on the totality of the circumstances and an objective standard. We presently apply these principles to the unique situation before us, which involves an officer whose initial, limited frisk of a suspect's outer clothing for weapons failed to either confirm or dispel the officer's reasonable suspicion that the suspect was armed and dangerous. This task requires us to make an assessment of what was reasonable — a point with which Justice Wecht appears to agree. *See, e.g.*, Concurring and Dissenting Opinion at 29 (Wecht, J.) ("it would have been **reasonable** for Officer Grant briefly to manipulate the object from outside of [appellant]'s clothing") (emphasis added); *id.* at 35 ("We are called upon here to maintain a necessary equilibrium between the competing state and private interests. Doing so requires a refinement of the scope of the standard in light of the facts at hand.").

But, Justice Wecht nevertheless faults the majority for "fail[ing] to limit the scope of the protective search to the least intrusive search reasonably available[,]" *id.* at 19, and allowing "the most intrusive aspect of a protective search" — reaching into a suspect's clothing — "when reasonable suspicion is at its nadir[,]" *id.* at 35. Justice Wecht would require the search "be proportional to the circumstances that induced it, escalating to a more intrusive search only when the circumstances reasonably warrant a more

---

Moreover, contrary to Justice Donohue's contention, the High Court's decision in *Dunaway v. New York*, 442 U.S. 200 (1979), does not dictate otherwise. In that case, the Court held only that application of a "balancing test" to "custodial interrogations" was inappropriate as, based on the particularities of the custodial interrogation environment, more than reasonable suspicion was required. *Id.* at 212. *Dunaway* did not address whether, much less hold that, the narrow application of the *Terry* exception in other contexts prohibits courts from assessing the validity of an investigative detention based on Fourth Amendment reasonableness standards.

substantial intrusion." *Id.* at 12-13. In other words, "as the reasonable belief that the suspect is armed waxes, the permissible scope of the protective search broadens[.]" *Id.* at 18; *see also id.* at 22 ("[A]n officer must employ the least intrusive means reasonably available[,]" which requires "an officer to acquire additional facts during the pat-down before manipulating the object and to obtain further facts during that manipulation before reaching into the suspect's clothing.").

Thus, although Justice Wecht agrees "reasonable suspicion that a suspect is armed and dangerous exists until extinguished by facts that negate the reasonable possibility of a weapon[,]" *id.* at 23 n.15, he would nevertheless adopt a framework that injects into the Fourth Amendment analysis a newly-minted "continuum of increasing invasiveness" evaluation, which, he submits, "generally requires facts indicating the presence of a weapon beyond those facts that justified the initial pat-down." *Id.* at 16; *see also id.* at 18 ("The search must be proportional to the circumstances that induced it, escalating to a more intrusive search only as the circumstances confronting the investigating officer necessitate a more substantial intrusion."); *id.* at 25 ("court[s] must weigh the quantum and quality of the Commonwealth's evidence against the level of intrusion, mindful that greater intrusions generally call for stronger or more abundant evidence").

This so-called "continuum" appears to involve three phases: "(1) the protective frisk itself, (2) the manipulation of an object felt during the pat-down, and (3) the reach into the clothing." *Id.* at 16. According to this theory, for the search to proceed at each stage, the officer must possess reasonable suspicion and that level of suspicion must increase proportionally with the increasingly invasive nature of the search. Where an officer has

conducted an open-handed pat-down and is unable to discern whether the object is or is not a weapon, Justice Wecht's newly-conceived second phase would require the officer to "briefly manipulat[e] the object from the outside of the individual's clothing in order to establish its tactile characteristics." *Id.* at 15. And, if that "manipulation reveals sufficient tangible qualities from which a reasonable officer would conclude that the object is a weapon, the officer may reach inside the suspect's clothing and remove the object." *Id.* at 21. It is at this stage, Justice Wecht posits, that reasonable suspicion should generally be at its "peak." *Id.*

This creative framework purportedly derives from *Sibron v. New York*, 392 U.S. 40 (1968), the companion case to *Terry*, and *Dickerson*, which all members of this Court now agree does not control here. The former decision supposedly "confirms that concerns for officer safety cannot justify a greater intrusion into a constitutionally protected area than the circumstances warrant[,]" Concurring and Dissenting Opinion at 12 (Wecht, J.), while the latter, we are told, "does not prevent an officer from manipulating an object in all circumstances[,]" *id.* at 14. But these broad-stroke characterizations provide scant support for Justice Wecht's novel position.

More importantly, "[e]ven assuming there [was a means of searching] that would have been less intrusive, it does not follow that the search as conducted was unreasonable." *City of Ontario v. Quon*, 560 U.S. 746, 764 (2010). Indeed, the United States Supreme Court has "repeatedly refused to declare that only the 'least intrusive' search practicable can be reasonable under the Fourth Amendment." *Veronica School Dist. 47J v. Acton*, 515 U.S. 646, 663 (1995). The High Court has cautioned that "[t]he logic of such elaborate less-restrictive-alternative arguments" — like the elaborate

"continuum" framework devised by Justice Wecht and embraced by Justice Donohue —

"could raise insuperable barriers to the exercise of virtually all search-and-seizure

powers." *United States v. Martinez-Fuerte*, 428 U.S. 543, 556 n.12 (1976).

As the Court explained in *United States v. Sharpe*, 470 U.S. 675 (1985), which

involved a twenty-minute *Terry* investigative detention, while "a 'bright line' rule would be

desirable, in evaluating whether an investigative detention is unreasonable, common

sense and ordinary human experience must govern over rigid criteria." *Sharpe*, 470 U.S.

at 685. The *Sharpe* Court instructed that courts should not indulge in unrealistic second-

guessing because:

> [a] creative judge engaged in *post hoc* evaluation of police conduct can
> almost always imagine some alternative means by which the objectives of
> the police might have been accomplished. But [t]he fact that the protection
> of the public might, in the abstract, have been accomplished by 'less
> intrusive' means does not, itself, render the search unreasonable. The
> question is not simply whether some other alternative was available, but
> whether the police acted unreasonably in failing to recognize or to pursue
> it.

*Id.* at 686-87 (internal citations and quotations omitted); *see also Revere*, 888 A.2d at 707

("the High Court has emphasized that, 'reasonableness under the Fourth Amendment

does not require employing the least intrusive means'") (citation omitted). As such, it is

not surprising that courts have, when warranted, "concluded that the means used to

address [a particular] concern, while not the least intrusive possible, were still minimally

intrusive given the practical difficulties in any other suggested approaches."

*Commonwealth v. Cass*, 709 A.2d 350, 356 (Pa. 1998) (citation omitted).

I would reach a similar conclusion here and reject the proposition that the Fourth

Amendment requires an officer to first manipulate a potentially threatening object through

a suspect's clothing before removing it. Justice Wecht opines this additional step is

needed to curtail unnecessary expansion of the protective search. Though I generally agree that reaching into a suspect's clothing and removing an object is comparatively more intrusive than a pat-down and, further, that police officers should attempt to pursue the least intrusive means reasonably necessary to effectuate a *Terry* stop, I ultimately disagree that the Fourth Amendment requires officers to "manipulate" a potentially dangerous weapon before they may lawfully remove it.

I do not arrive at this conclusion lightly. Protective searches are, as the *Terry* Court expressed, "a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment[.]" *Terry*, 392 U.S. at 17. However, while Justice Wecht's approach might allow a less intrusive search before removing the object, in my view his proposed intermediate step is more useful in theory than it is workable in practice. Notably, although the manipulation of an object is relatively innocuous in the *Dickerson* context where officers are handling "non-threatening" contraband, requiring the manipulation of an object **that might still be a weapon** is problematic from both an officer and suspect/bystander safety perspective. This new element would require officers to move, squeeze, or otherwise handle a potentially dangerous weapon they cannot see and, in some cases, particularly where a suspect is wearing bulky clothing, cannot sufficiently feel in its entirety.[5] While the manipulation of some weapons through clothing

---

[5] Justice Wecht contends officers are "accustomed to performing [such] investigative measure[s]," and he suggests his manipulation requirement is consistent with current police practice. Concurring and Dissenting Opinion at 15-16 (Wecht, J.). In support, he notes the Philadelphia Police Department's manual of directives "instructs officers performing certain searches to proceed by 'grabbing, squeezing[,] or sliding of hands over the remaining clothing to detect a weapon[.]'" *Id.* at 16, *quoting* Phila. Police Dep't Directive 5.7 §21(H)(1)(a). This argument is unpersuasive for several reasons. First, the language Justice Wecht selectively quotes derives from a definitional subsection of a

may not pose a threat, the same cannot be said of others. Officers can encounter a wide range of weapons, including, for example, firearms without trigger guards or with modified trigger pull weight, which could fire if handled improperly and cause grievous injury.[6]

A central consideration in *Terry* was protecting "the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him." *Id.* at 23. If an officer encounters a suspect who is potentially armed and dangerous, I would not require that officer to risk serious injury by possibly mishandling a weapon hidden from view. In short, although Justice Wecht's effort to devise a least-intrusive framework

---

policy pertaining to "Strip and Body Cavity Searches," which is not what we are dealing with here. Second, it is significant that the directive states only that an officer "**can**" use manipulation techniques, not that he **must.** Phila. Police Dep't Directive 5.7 §21(H)(1)(a) (emphasis added). Finally, and in any event, it is worth noting this police directive — which, according to the website link provided by Justice Wecht, appears to have been last updated in 2016 — is not contained in the certified record, and thus we have no way of knowing for sure whether it is authentic or even current.

[6] Justice Wecht asserts this concern is "misplaced" because "[r]eaching into a suspect's clothing and grasping objects," which "officers regularly and safely" do, is "arguably more dangerous" than manipulating an object through an individual's clothing. Concurring and Dissenting Opinion at 15 n.9 (Wecht, J.). I respectfully but emphatically disagree. While it is true that reaching into a suspect's pocket and retrieving an item that could be a weapon is an inherently dangerous task, it is surely more dangerous to manipulate that object through clothing. When an officer squeezes, turns, moves, or otherwise handles an object through clothing, that officer does so without being able to affirmatively discern the object's material, which can be instructive, if not dispositive, in identifying what that object is. In contrast, an officer reaching into a suspect's pocket to touch the object in question can immediately perceive the object's material, including whether it has a grooved handle, metal slide, or other feature that would aid in identifying whether it is a weapon and its position. Placing one's hand on an object provides critical information often unavailable when attempting to manipulate a potentially dangerous weapon through bulky clothing or other clothing materials. For this reason, I strongly disagree that officers "**undoubtedly** have the capacity . . . to manipulate objects briefly from outside suspects' clothing without creating dangerous situations[,]" and I do not believe the Fourth Amendment imposes such a requirement on police officers attempting to neutralize potentially dangerous situations. *Id.* (emphasis added).

for the present situation was worthwhile, in my respectful opinion, the test he offers is impractical for police officers — who are not legal technicians pondering the situation with the benefit of hindsight and plenty of time — to execute safely.

To summarize the relevant principles, a stop and frisk is constitutionally valid when the following conditions are met:

> First, the investigatory stop must be lawful. That requirement is met in an on-the street encounter . . . when the police officer reasonably suspects [ ] the person apprehended is committing or has committed a criminal offense. Second, to proceed from a stop to a frisk, the police officer must reasonably suspect that the person is armed or dangerous.

*Arizona v. Johnson*, 555 U.S. 323, 326-27 (2009). The present appeal involves a third situation not yet addressed by the United States Supreme Court, *i.e.*, what may an officer do when a frisk of a suspect's outer clothing fails to confirm or dispel a reasonable belief that the felt object may be a weapon? I would resolve that issue by adding the following element to the above test: "Third, if, after a lawful *Terry* frisk, the facts available to the officer fail to confirm or dispel a reasonable belief that the felt object might be a weapon, the officer may remove the object from within the suspect's clothing." In my view, requiring more would be unreasonable and would needlessly jeopardize officer safety.

### C. Application

Applying these principles to the facts of this case, I easily agree with the majority that suppression is unwarranted here. The suppression court reviewed the following facts to determine whether the officer had reasonable suspicion to remove the object from appellant's pocket: appellant was a passenger in a vehicle that fled from police in a high-crime area in the early morning hours; the officer had experience recovering weapons from traffic stops in the area where he and his partner stopped appellant; three days before this incident, five people were shot at the intersection where one of the fleeing cars

crashed; the officers stopped appellant and the other two vehicle occupants on foot and did not have the protection of their patrol car; during the stop appellant was blading his body away from the officers and reached into his pockets; appellant continued to reach into his pockets even after the officer repeatedly directed him to stop; the officer conducted an open-handed pat-down and identified a hard, large object in appellant's left side pants pocket; and the officer could not determine what the object was from the pat-down alone, and feared it could be a weapon. Evaluating these facts under a reasonable suspicion standard, and in the light most favorable to the Commonwealth, there can be no doubt that Officer Grant did not exceed his constitutional authority by reaching into appellant's pocket and removing the potentially life-threatening object secreted inside.

Of course, Justice Wecht faults Officer Grant for failing to adhere to his newly-concocted, multipart "continuum" framework. *See* Concurring and Dissenting Opinion at 30 (Wecht, J.) (Officer Grant was required "to take that less intrusive step [of manipulating the object] before reaching into [appellant]'s pocket"). Justice Wecht also blames the majority for relying exclusively upon what he characterizes as "the minimal, low-quality evidence that warranted the initiation of the protective search." *Id.* That evidence includes appellant's "suspicious movements and his noncompliance with Officer Grant's commands[,]" factors Justice Wecht deems "weak indicators of a weapon." *Id.*; *see also id.* at 27 (arguing, without citing any supporting authority, that although appellant's "movements were consistent with an attempt to conceal a weapon, they were equally, if not more, indicative of concealing nonthreatening contraband or an embarrassing item"). Justice Wecht also discounts the "reckless driving" by the drivers of the fleeing vehicles which "is not a crime inexorably associated with weapons." *Id.* at 26. As Justice Wecht

sees it, when all of this other evidence is systematically eliminated from the reasonable suspicion calculus, all that remains is "the presence of a hard object[.]" *Id.* at 30; *see also id.* at 31 (contending the majority "has birthed the 'hard object' exception to the warrant requirement").

Justice Donohue takes an even dimmer view of the evidence. She perceives only "four key facts that . . . support the [m]ajority's conclusion that Officer Grant reasonably suspected that the object he felt was a weapon[,]" including: "the object was (1) large, (2) hard, and (3) could have been a weapon or (4) firearm." Concurring and Dissenting Opinion at 7-8 (Donohue, J.). According to Justice Donohue, the majority relies on "generic facts . . . such as [appellant]'s presence in a vehicle involved in a police chase, a high crime area, and [appellant]'s attempt to shield his body from view while in the vehicle." *Id.* at 9 n.6. Although Justice Donohue concedes appellant's "act of blading his body while inside the vehicle indicates danger," she nevertheless summarily dismisses it as irrelevant since "the officers did not draw their firearms." *Id.* Even with respect to those factors Justice Donohue would credit, such as Officer Grant's testimony the object he felt was "hard" and "large," she considers it to be "inherently subjective" and "meaningless[.]" *Id.* at 7-8. Justice Donohue concludes the evidence fails to show "that an objectively reasonable police officer would suspect that the item was a weapon[,]" and she rechristens what Justice Wecht labels as the majority's "hard object" exception to the warrant requirement as the "'indeterminate object' exception." *Id.* at 9.

Respectfully, my learned colleagues' recounting of the evidence is abridged and selective. Keeping in mind that reasonable suspicion "falls considerably short of 51% accuracy," *Glover*, 140 S.Ct. at 1188 (internal quotations and citation omitted), the totality

of the evidence of record, when viewed in the light most favorable to the Commonwealth, was more than enough to support Officer Grant's belief that appellant may have possessed a weapon.

Appellant was stopped shortly after 4:15 a.m., when it was still dark, and after the car in which he was a passenger drove away from the officers' marked police car in an erratic, dangerous, and evasive manner. These factors support a finding of reasonable suspicion to believe appellant may have been armed and dangerous. *See, e.g., In re O.J.*, 958 A.2d 561, 566 (Pa. Super. 2008) (where "vehicle stop occurred at night, which creates a heightened danger that an officer will not be able to view a suspect reaching for a weapon[,]" and the car "had been driving dangerously and initially refused to heed police efforts to stop . . . [t]his evasive behavior supported [a reasonable fear that the defendant] may have been engaged in criminal behavior **and in possession of a weapon"**) (emphasis added). That this all occurred in a high-crime area in which the arresting officer had personal experience recovering weapons during traffic stops — and where the officer knew that, only three days earlier in the nearby area, five people were shot — is also a highly relevant consideration. *See, e.g., Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (while presence in a high-crime area, standing alone, is insufficient to establish reasonable suspicion, "officers are not required to ignore the relevant characteristics of a location[,]" and this factor is "among the relevant contextual considerations in a *Terry* analysis").

So too is the fact that appellant was blading his body away from the officers while reaching into his pockets, and his failure to abide by the officers' commands to stop this

naturally concerning, furtive movement.[7]  There is also, of course, Officer Grant's discovery during his initial frisk of a "large" and "hard" object in appellant's pocket that he testified he could not rule out was a weapon.  *See, e.g.*, *Taylor*, 771 A.2d at 1270 (removing pill bottle from defendant's pocket lawful, as officer "testified that the object was hard and about four inches long" and thus "was reasonable in suspecting that [the defendant] could be armed").

As this full accounting of the evidence makes clear, the totality of the circumstances here includes far more than the bare fact that Officer Grant felt a "hard" or "indiscriminate" object.  The only way to conclude otherwise is by improperly casting the facts in the light most favorable to appellant, or by improperly requiring a showing of more than reasonable suspicion, *i.e.*, by "demand[ing] scientific certainty . . . where none exists" and forbidding officers from making "commonsense judgments and inferences about human behavior."  *Wardlow*, 528 U.S. at 125.  Respectfully, because my esteemed colleagues in partial dissent make both mistakes (as well as misconstrue applicable and binding Fourth Amendment precedent regarding "reasonableness" and "least intrusive means"), we properly reject their conclusion that suppression is warranted.

---

[7] The act of "blading"— a common term known to law enforcement — is generally understood as suspicious body posturing and has been held by some courts to bolster the factors amounting to adequate suspicion.  *See, e.g.*, *Commonwealth v. Karen K*, 164 N.E.3d 933, 936 (Mass. App. Ct. 2021) ("blading is a term of art that has been recognized and defined . . . as hiding one side of the body from the other person's view.") (internal quotations and citation omitted).  It is well known that blading is a technique used by people in possession of illegal items, including firearms, as a way to obscure the illegally possessed item from the view of police.  *See, e.g.*, *Commonwealth v. Bozeman*, 205 A.3d 1264, 1276 (Pa. Super. 2019) (officer testifying that "when a suspect 'blades' his body away from [an] officer in such a way that conceals his waistband, it is an indication the suspect might be armed"); *see also United States v. Coleman*, 2010 WL 2254922, at *1 (3d Cir. June 7, 2010) (officer explaining that blading is a trait consistent with concealing weapons).

### III. Recommendations

Notwithstanding the foregoing discussion, I take very seriously those concerns expressed by my colleagues regarding overzealous police searches. But, in my view, the objective reasonable suspicion standard provides safeguards that are fully realized when suppression courts fulfill their role in meaningfully evaluating the evidence presented to determine if reasonable suspicion existed throughout the *Terry* encounter. Accordingly, I write briefly now to emphasize the crucial role suppression courts play in making such determinations, as well as to make some recommendations for improving the process.

A hallmark of our justice system is the adversarial process, wherein the government's evidence is tested, and a court, sitting as the neutral arbiter, is tasked with weighing the evidence presented and reaching a conclusion consistent with the law. The court's role is not simply to accept the evidence presented, but to scrutinize whether the appropriate standards of proof and evidentiary requirements are met.[8] When this critical role is not properly served, the adversarial process fails, and individual rights are jeopardized. To ensure the process works as it should, I believe courts ought to consider the following (non-exhaustive) list of factors in assessing whether a *Terry* frisk, and any evidence derived therefrom, conforms with Fourth Amendment protections.

First, in assessing cases such as the one presented here, it is incumbent on suppression courts to meaningfully assess the totality of the circumstances surrounding

---

[8] Indeed, the U.S. Supreme Court recognized the critical role courts play in *Terry*, noting the "scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search and seizure in light of the particular circumstances." *Terry*, 392 U.S. at 21.

a *Terry* stop to adequately determine what precipitated the stop and the officer's conclusion a frisk was proper. In doing so, courts should consider such factors as those that have always weighed into this analysis — the characteristics of the area in which the suspect was stopped, the officer's level of familiarity with that area, the officer's training and experience, the suspect's actions or movements before the stop, whether the officer acted alone and/or had the protection of a patrol vehicle, and what specific, articulable facts led the officer to believe criminal activity was afoot and the suspect was potentially armed and dangerous.[9]

Second, a suppression court should assess any tactile impressions an officer provides with respect to the object felt during the open-handed pat-down that led that officer to believe the object could be a weapon. Here, as Justice Wecht aptly notes, helpful information may include the object's "size, density, material composition, shape, and location[.]" Concurring and Dissenting Opinion at 25 (Wecht, J.). Also relevant to the officer's assessment could be the suspect's body language or movements immediately preceding or during the *Terry* frisk.

Notably, there will be times when the level of tactile detail is lacking. For instance, if a frisk occurs in the winter and the suspect is wearing bulky clothing, such apparel may make it difficult to assess the particulars of an object's shape, size, or material through an open-handed pat-down. However, the absence of such information is not dispositive and does not automatically necessitate suppression. A suppression court's decision should not turn on the presence or absence of one fact or a particular detail, as there will

---

[9] Because the reasonableness of the initial *Terry* stop is not at issue in this case, it is unnecessary to further examine the factors guiding this aspect of the analysis.

be instances when such tactile impressions cannot be discerned. *See* Concurring and Dissenting Opinion at 24-25 (Wecht, J.). Where such information is lacking, the suppression court should assess whether that absence is reasonable given the circumstances.

Moreover, in evaluating the facts surrounding a given search, courts must consider the evidence by an objective standard, rather than deferring to the subjective assessment of the officer. In so doing, the court should examine the totality of the circumstances, and whether the tactile impressions and/or facts the officer observed were consistent with the conclusion the suspect may be armed and dangerous. *See, e.g.*, *United States v. Albert*, 579 F.3d 1188 (10th Cir. 2009) (concluding search for weapons was not permissible where the object felt was soft in nature); *State v. Bitterman*, 232 N.W.2d 91, 94 (Minn. 1975) (because "weapons are not always of an easily discernible shape," it is not essential the officer feel the contours of the firearm to believe it may be a weapon); *State v. Evans*, 618 N.E.2d 162, 171 (Ohio 1993) (where the officer felt "large bulk" and "knew it wasn't a gun," search was still proper as officer was "unable to conclude that the object was not a knife or other weapon"). Often the court's assessment can be aided by a comparison of what the officer felt and observed with what was ultimately recovered.

I further note that for courts to adequately assess whether reasonable suspicion existed and remained present, it is also incumbent on police officers to state the "specific and articulable" facts *Terry* requires, not just with respect to the events leading to the frisk or the surrounding environment, but also with respect to the object itself. Officers should provide as much detail as possible to convey why the object in question could be a weapon and why they could not rule out the possibility the object was a weapon without

further inspection or removal of it from the suspect's clothing.[10]  To this end, officers should not rely on broad generalities, or assume certain "magic words" will satisfy the reasonable suspicion standard.  Likewise, prosecutors presenting this evidence should be cognizant that specificity is, where available, beneficial both at the motion stage and on appeal.[11]

---

[10] As Justice Wecht aptly notes, "[a] trial court's finding that the officer's suspicions were reasonable is more likely to survive appellate review when the record contains credible testimony accounting for more of those descriptive features."  Concurring and Dissenting Opinion at 25 (Wecht, J.).

[11] Justice Donohue predicts it is "unlikely that the Commonwealth will pay any attention to [this] advice" because prosecutors supposedly will "point to the facts of this case in future suppression hearings" as a basis for eliciting **less detailed** testimony from police officers.  Concurring and Dissenting Opinion at 10 (Donohue, J.).  This builds on one of the central themes of Justice Donohue's position, *i.e.*, that the "officer's candid testimony that he did not know what the object was but merely feared it 'could be' a weapon is plainly insufficient to establish that [appellant]'s rights were not violated."  *Id.* at 6.

As explained at length, however, the totality of the circumstances here, including Officer Grant's identification of a large and hard object he believed might be a weapon, provided the requisite reasonable suspicion to proceed into appellant's pocket.  To state the point differently, Officer Grant's testimony was alone sufficient as a matter of law to "prove[] to the satisfaction of the suppression court that the evidence was properly seized."  *In re L.J.*, 79 A.3d 1073, 1086 (Pa. 2013).  Those more pointed questions Justice Donohue believes the prosecutor should have asked beyond this in pursuit of additional "contextual comparison[,]" Concurring and Dissenting Opinion at 8 (Donohue, J.), while perhaps desirable, were simply not required.  The Commonwealth met its burden of production and persuasion based solely on Officer Grant's testimony.

I strongly suspect that, in future cases, defense counsel will not be as complacent as counsel was in this case, but will instead seek to rebut the Commonwealth's burden by asking more probing questions along the lines of those identified by my learned colleague.  While defense counsel is, of course, under no obligation to question a prosecution witness, doing so may well yield testimony that, objectively speaking, **dispels** an officer's otherwise reasonable belief that the defendant may have possessed a weapon.  But, the fact such evidence was not elicited here (either by the prosecutor or defense counsel) does not mean the majority's ruling in this case somehow creates a *per se* rule that categorically eases the Commonwealth's burden at the suppression hearing.

When courts sufficiently scrutinize the non-exhaustive list of factors detailed above, evaluate witness credibility, and assess the evidence presented by an objective reasonable suspicion standard, Fourth Amendment protections are adequately safeguarded. With these additional observations, I fully join the majority.

Justice Todd joins this concurring opinion.